THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DELORES BERGER *et al.*, Defendants-Appellants.

Second District   No. 81—715

Opinion filed November 1, 1982.

Martin J. Weisenburger, of Chicago, for appellants.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Judith Pietrucha, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Christine Berger attended high school 12½ days out of 352 school days during the academic years 1979-80 and 1980-81.

Her parents, Delores Berger and Lawrence Berger, were each charged with permitting the truancy of a child in violation of the Illinois compulsory attendance statute (Ill. Rev. Stat. 1979, ch. 122, par. 26—10). Following a consolidated bench trial, the defendants were both found guilty and sentenced to one year's probation.

On appeal, the defendants contend that (1) they were not proved guilty beyond a reasonable doubt of knowingly and wilfully permitting a child to be truant, (2) they were denied the effective assistance of trial counsel, and (3) the trial judge erred in permitting prosecutors to introduce evidence of a pending criminal prosecution at the sentenc-

ing hearing.

Section 26—10 of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 26—10) provides:

"Fine for noncompliance. Any person having custody or control of a child subject to the provisions of this Article to whom notice has been given of the child's truancy and who knowingly and wilfully permits such a child to persist in his truancy within that school year, upon conviction thereof shall be guilty of a Class C misdemeanor and shall be subject to not more than 30 days imprisonment and/or a fine of up to $500."

The facts are hardly disputed. The defendants do not deny that Christine Berger did not attend school 339½ days during the school years 1979-80 and 1980-81. Christine Berger was 14 and 15 years old during those school years. Jan Howes, a Lake County truant officer, testified that she sent the defendants a letter which notified them of Christine's absence on February 15, 1980, and advised them of their legal responsibility to see that she attend school. She further advised that a doctor's certificate was required to excuse a child's illness. Howes sent a second letter on February 25, 1980, advising that the matter was being referred to Probation Intake for action and that prosecution for noncompliance was possible. She also phoned Mr. and Mrs. Berger who explained that Christine was ill. Howes informed them that Christine could receive home-bound tutoring if she obtained a doctor's certification that she was unable to attend school.

Elvera Kasberger, dean of students, testified that on August 27, 1980, Mrs. Berger brought Christine to the registrar, but when Christine complained of a headache, Mrs. Berger took her home. Dean Kasberger informed Mrs. Berger that the parent of a sick child should inform the attendance office each day a child is sick and that a doctor's verification should be presented to reinstate a student absent for more than five consecutive days. The following day Christine also left school early and she did not return during that year. Dean Kasberger received no doctor's excuses. She sent three truancy letters to the defendants, the second two of which were refused and returned. She was unable to contact them by phone. Kasberger testified that on November 12, 1980, she received a letter from Doctor Aven excusing Christine from school for three weeks to undergo allergy testing, but that excuse was later rescinded.

Doctor Allen Aven, a family practitioner specializing in clinical ecology, testified that he saw Christine in November 1980. He performed a series of 35 tests for different materials found in the environment and Christine exhibited a sensitive reaction to 13 of the

tests, including formaldehyde, a variety of molds, tobacco, milk, some pollens, insect spray, and some dust particles. He suggested that with proper treatment Christine could function adequately and perhaps normally and he concluded that she probably could attend school. He excused Christine from school during the testing, but rescinded the excuse when she stopped coming in for testing. Cora Friedl, the attendance clerk at Christine's high school, verified that during the 1979-80 year Christine attended only 3½ days out of 176. Friedl was told by Mrs. Berger that Christine had allergies and was too ill to attend school. In the 1980-81 school year, Christine was credited with attending nine days out of 176. Mrs. Berger called three times in September to report a doctor's appointment and Christine's illness, and although Friedl requested a medical certification, none was ever received. She notified the defendants that Christine was not present for her first semester's exams and was told that Christine was at a clinic.

The school nurse, Ardell Frandsen, stated that Christine came to her office twice in August and September of 1979, complaining of cramps and allergies and left school. Nurse Frandsen requested a physical examination report for Christine's records and later received one filled out by Doctor Goldberg, which indicated allergic rhinitis, or "a little nasal congestion." She received another note from Doctor Goldberg stating that Christine was suffering from headaches due to allergies. When she called him, he said that the allergies alone were not severe enough to warrant Christine's absence from school. Christine went to Nurse Frandsen's office twice in August of 1980, complaining of a headache and an earache. On September 12, 1980, Nurse Frandsen received a note from Doctor Pollock excusing Christine from gym class. She phoned the doctor and he said that Christine's allergies were not severe enough nor was there any medical reason for Christine to be absent from school. Neither Nurse Frandsen nor her office ever received a medical certificate excusing Christine from class.

Delores Berger, Christine's mother, testified in her own defense that she had explained Christine's situation to Dean Kasberger. Mrs. Berger said Christine could not attend school because she would experience headaches and a severe ringing in her ears. She spoke to Truant Officer Howes and a man from the Lake County Youth Service Bureau about Christine's truancy. Christine had to be hospitalized in May 1980; she was diagnosed at the Monroe Clinic as having migraines; she was in the hospital in November 1979, she began seeing Doctor Randolph in December 1980, and she saw Doctor Goldberg for allergy treatments from September 1979 to March 1980. Mrs. Berger

testified that she had taken Christine to 13 doctors in two years. She said that Doctor Goldberg gave her a verbal medical excuse the school would not accept and that she was not told about home-bound tutoring and that she requested it and was refused. She acknowledged that the note she received from Doctor Aven was to dismiss Christine from school for testing. She had asked Doctor Goldberg not to communicate with the school because she said the school nurse told him that Christine got headaches only at school and not at home. She never inquired of Doctor Goldberg about home-bound tutoring. Mrs. Berger testified that Doctor Goldberg gave her some notes regarding Christine's allergies which she gave to the school and that she thought the people at the school were hiding all of the doctor's notes. She then said that she had requested a note from Doctor Goldberg and he replied that he could not write one because he did not yet know what was wrong with Christine. Mrs. Berger said her daughter's absences had always been because of allergies. When Christine was at home she would read if her eyes did not hurt, watch TV or listen to the radio. Mrs. Berger stated that even when Christine was able to read she could not attend school because of the chemicals in the school environment, such as chlorine in the pool, alcohol in the laboratory and nurse's office, and mimeographic paper, and the fact that the school was heated by natural gas. She testified that she smoked at home but not around her daughter. Her daughter's specific complaints to her were pain in her knees, ringing in her ears, severe eyeache and chest pains. Mrs. Berger said the chest pains had disappeared having been caused by medication prescribed by the doctors and that which the school nurse ordered Christine to take on several occasions. Mrs. Berger testified that her daughter attended school two or three days in 1980-81; she stopped seeing Doctor Aven before he finished testing Christine saying that she was seeking answers to Christine's symptoms. Doctor Pollock had told Mrs. Berger that Christine had a chemical imbalance but could not test for it so she went to Doctor Aven. Doctor Aven told her that some of Christine's reactions could be counteracted but that he was not sure whether Christine could take a formaldehyde antitoxin. Christine was supposed to take two years of biology and Doctor Aven had proposed to discuss the formaldehyde and insecticide problems with the school after he finished testing. Mrs. Berger testified that Christine's illness, though present, was not the same as it had been because Christine had been taking some medicine for three weeks, but she had not attended school because she had nothing to counteract her alcohol allergies.

Lawrence Berger, Christine's father, testified that Christine had

been sick for quite awhile, had been to numerous doctors, a clinic and a hospital for tests and had taken numerous prescriptions but nothing seemed to help. He acknowledged that he was aware that his daughter was not attending school; that he received a letter and a phone call from the school authorities and explained Christine's absence. He further testified that his wife procured a medical certificate allowing Christine to remain out of school on a permanent basis and that she presented letters from different doctors which either ran out of time or were not acceptable. Doctor Theron Randolph testified that he began seeing Christine on December 22, 1980. After testing, he found that Christine was highly susceptible to a wide range of environmental exposures frequently found in both the outside air and the inside air at school and at home. Christine's symptoms were sore throat, headache, earache, nervousness, excessive gas, abdominal cramps, elbow and knee joint problems, muscle cramps, extreme fatigue, nasal stuffiness, occasional hives, intermittent depression, sometimes fits of anger and screaming, and extreme irritability and intermittent excessive perspiration. He presumed that Christine's condition developed as the result of exposure to a sewage disposal plant near her home and possibly the gas utilities in her home, or certain exposures in her school. He recommended that she move to an all-electric home in a less polluted area. On cross-examination, he testified that he was told by Christine and her mother that Christine was more ill when she attended school upon which he based his opinion of the effects of the school. He never wrote to the school directly. He last saw Christine at his office in April 1981, and her diagnosis as to allergies was unchanged.

The defendants' first contention is that they were not proved guilty beyond a reasonable doubt. They do not deny that Christine failed to attend almost all of the two school years in question. Rather, their defense is based upon the assertion that mere absence from school does not constitute truancy. As support for their argument, the defendants cite section 26—2a of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 26—2a), which reads as follows:

> "A 'truant' is defined as a child subject to compulsory school attendance and who is absent without valid cause from such attendance for a school day or portion thereof.
>
> 'Valid cause' for absence shall be illness, death in the immediate family, family emergency, and shall include such other situations beyond the control of the student as determined by the board of education in each district, or such other circumstances which cause reasonable concern to the parent for the safety or

health of the student.

'Chronic or habitual truant' shall be defined as a child subject to compulsory attendance and who is absent without valid cause from such attendance for 15 out of 90 consecutive school days.''

The defendants contend, that since Christine's illness arising from allergies is well established, under the applicable statutory definition there is no ground for truancy upon which the defendants' convictions were based, reasoning as follows: (1) truancy is absence *without* valid cause; (2) illness is a valid cause for absence; (3) Christine was ill; (4) therefore, Christine was not truant. The defendants also argue that there is nothing in the statutory definition which makes illness contingent upon a doctor's statement. They further assert that Christine's illness was sufficient to "cause reasonable concern to the parent for the \*\*\* health of the student." Ill. Rev. Stat. 1979, ch. 122, par. 26—2a.

The definitions upon which the defendants rely must be considered in the context of the entire statute. (*Jahn v. City of Woodstock* (1981), 99 Ill. App. 3d 206, 209.) Each provision should be construed in connection with every other section and in the light of the statute's general purpose. (*Miller v. Department of Registration & Education* (1979), 75 Ill. 2d 76, 81.) However, section 26—1 of the statute, which the defendants do not even consider, provides exemptions for children who are physically unable to attend school:

"Whoever has custody or control of any child between the ages of 7 and 16 years shall cause such child to attend some public school in the district wherein the child resides the entire time it is in session during the regular school term, except as provided in Section 10—19.1; Provided, that the following children shall not be required to attend the public schools:

1. Any child attending a private or a parochial school \*\*\*;

2. Any child who is physically or mentally unable to attend school, such disability being certified to the county or district truant officer by a competent physician; or who is excused for temporary absence for cause by the principal or teacher of the school which the child attends; \*\*\*." (Ill. Rev. Stat. 1979, ch. 122, par. 26—1(1), (2).)

The defendants cannot urge, on the one hand, that Christine was too ill to attend school for two years and then totally disregard the provision for such students, which clearly requires a doctor's certification. There is an alternative basis to support the school's requirement of a doctor's excuse. The School Code specifically provides that a school

board has the duty "[t]o adopt and enforce all necessary rules for the management and government of the public schools of their district." (Ill. Rev. Stat. 1979, ch. 122, par. 10—20.5.) There was testimony that school policy required a doctor's excuse for reinstatement when a student missed more than five consecutive school days. School authorities' discretion in a similar matter (determining what constitutes a sufficient excuse for absence from school) has been upheld, and the court will not interfere absent an abuse. (*People ex rel. Latimer v. Board of Education* (1946), 394 Ill. 228, 235-36.) A doctor's certification that a child is unable to attend school is a reasonable requirement, not an abuse of discretion. It both verifies a child's medical condition and promotes administrative efficiency in monitoring attendance.

■ The objective of the compulsory attendance law has been established—that all children be educated. (*Morton v. Board of Education* (1966), 69 Ill. App. 2d 38, 45.) Where the main intent of the legislature can be determined, words may be modified, altered, or supplied so as to obviate any inconsistency with the legislative intention. (*Community Consolidated School District No. 210 v. Mini* (1973), 55 Ill. 2d 382, 386.) The "illness" contemplated in section 26—2a must surely be one that would warrant absence from school. Applying the facts of this case to the statute under which the defendants were prosecuted, Christine was shown beyond a reasonable doubt to be truant. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence and the credibility of the witnesses unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Hall* (1982), 104 Ill. App. 3d 1064, 1069.) In this case, although Christine saw 13 doctors in a two-year period, there was no evidence that a single doctor thought her unable to attend school for this two-year period. There was, however, medical testimony that she could have attended school. And, even if she was unable to attend school, which was not proved, all the school personnel who testified stated that no medical certificate was ever received by school personnel which indicated that Christine had been absent due to illness, or that she was unable to attend school, and the defendants did not credibly refute this proof. Thus, the degree of illness established regarding Christine's allergies was not one which would amount to a valid cause for such a protracted absence. Here the court's finding of guilty was clearly supported by the evidence, and each element of the charge was proved. The record established that defendants, as Christine's parents, had custody of her; that at 14 and 15 years of age she was within the statutory age

range of seven to 16; that the defendants received the requisite notice of their daughter's protracted absences; and they admittedly knew of and supported her inattendance which amounted to truancy.

The defendants' second contention is that their trial counsel, whom they retained, did not assist and represent them effectively when he (1) failed to obtain any discovery prior to trial; (2) failed to insist that closing arguments and the trial judge's findings be recorded; (3) failed to cross-examine prosecution witnesses, and redirect examine defense witnesses, and (4) failed to prepare adequately. The State argues that the defendants neither demonstrate actual incompetence nor indicate how the alleged errors prejudiced their case.

We note that following the decision of the United States Supreme Court in *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708, the same standard in reviewing competency pertains to retained and appointed counsel, that being whether the defendant's attorney was actually incompetent in carrying out his duty to his client to defendant's substantial prejudice. (*People v. Talley* (1981), 97 Ill. App. 3d 439, 443; *People v. Scott* (1981), 94 Ill. App. 3d 159, 164; *People v. Lovitz* (1981), 101 Ill. App. 3d 704, 710.) The Illinois cases set out several factors to be considered on the competency question. The presumption that a member of the bar in good standing is competent will be overcome only by strong and convincing proof of incompetence. (*People v. Ruple* (1980), 82 Ill. App. 3d 781, 786.) A defendant is entitled to competent, not perfect, representation (*People v. Berland* (1978), 74 Ill. 2d 286, 311, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 63); nor is a defendant entitled to a successful defense (*People v. Ruple* (1980), 82 Ill. App. 3d 781, 786). Competency is determined from the totality of counsel's conduct at trial. (*People v. Steel* (1972), 52 Ill. 2d 442, 453; *People v. Julian* (1980), 89 Ill. App. 3d 60, 64.) Conduct which can be shown to be an exercise of judgment, discretion, or trial strategy does not prove incompetency. (*People v. Newell* (1971), 48 Ill. 2d 382, 387; *People v. Coss* (1977), 45 Ill. App. 3d 539, 542.) Proof of prejudice cannot be based on mere conjecture. (*People v. Hills* (1980), 78 Ill. 2d 500, 506; *People v. Nutall* (1980), 91 Ill. App. 3d 758, 767.) A defendant also may not rely on speculation as to the outcome of his case had the representation been of higher quality. (*People v. Thomas* (1972), 51 Ill. 2d 39, 44; *People v. Hills* (1980), 78 Ill. 2d 500, 506.) Nor is the test what appellate counsel would have done or would have liked seen done. *People v. Barbour* (1972), 5 Ill. App. 3d 323, 326.

The defendants point out that the record shows no pretrial motions or requests for discovery, specifically for the school and medical

records which were introduced at trial by the State. They contend that the trial counsel should "have moved for production of those matters which tend to negate the guilt of the defendants." The State, however, argues the defendants failed to indicate how such lack of discovery prejudiced their convictions and that the defendants' former counsel also did not see fit to file any discovery motions. The State notes that six of the exhibits it introduced simply verified Christine's absence from school, which was no secret to the defendants; the other three exhibits were two notes from Doctor Goldberg and the nurse's note regarding a phone call to Doctor Pollock, and the defendants were well aware of their daughter's medical history.

In *People v. Howard* (1979), 74 Ill. App. 3d 138, the defense counsel's failure to discover the medical records of the defendant's psychiatric history for use at a competency hearing amounted to ineffective assistance of counsel. That information contradicted evidence presented at the hearing upon which the court heavily relied and, therefore, clearly could have affected the outcome of the trial. (74 Ill. App. 3d 138, 141.) In the present case, there is no attempt by trial counsel to seek discovery reflected in the report of proceedings, but it is difficult to envision how this could have affected the defendants' case adversely. The exhibits defendants mentioned did not contain information unknown to them. Nor do the defendants suggest exactly what matters, lack of discovery of which they now complain is error, would have "tended to negate" their guilt, and there was certainly nothing exculpatory in the State's evidence. The defendants neither produced a doctor's certification of Christine's inability to attend school, nor showed that Christine was receiving a private education, either of which would have been a defense. Since these defenses appear to have been nonexistent, information proving them could hardly have been procured through discovery. Since the defendants fail to point to any prejudice arising from the failure to seek discovery, and we can perceive of none, ineffective assistance of counsel cannot be found on this basis.

The defendants also assign as error evidence of their counsel's incompetence due to the lack of a record of closing arguments and the judge's findings, which they contend deprives them of asserting on appeal any specific errors which might have occurred during those proceedings. The defendants cite the case of *People v. Coss* (1977), 45 Ill. App. 3d 539, 543, as authority for this argument. This case, however, does not pertain to the absence of a record, but deals rather with a trial counsel's improper failure to participate in a revocation proceeding after being admonished to do so by the trial judge. The

State responds the defendants merely speculate that errors might have occurred and again have neither shown that prejudice occurred nor even suggested a prejudicial nature of the prosecutor's final argument.

■ In *People v. David* (1981), 96 Ill. App. 3d 419, the court in *dicta* stated that failing to request a transcription of final arguments is not an indication of incompetence of counsel or of judicial carelessness but rather is commonly done to save costs. The court expressed its concern that to reverse a conviction on that basis would invite the practice of deliberately building error into the record or, "sandbagging." The court also noted the supreme court rule for reconstructing an absent record. (96 Ill. App. 3d 419, 422.) Under this rule, a proposed report of proceedings may be prepared by the appellant from the best available sources, including recollection, and submit it to the trial court for settlement and approval, after which, if certified, it is included in the record on appeal; or, the parties may stipulate to a statement of facts material to the controversy. (85 Ill. 2d R. 323(c), (d).) Under Rule 612(c) (73 Ill. 2d R. 612(c)) these rules are applicable to criminal appeals. In *People v. Owens* (1978), 58 Ill. App. 3d 37, where a transcript of a hearing was not available, the court said that where a defendant failed to supplement the record on appeal as provided by the above rules and did not cite as error anything which occurred at the hearing, the court would presume that no error occurred. (58 Ill. App. 3d 37, 40-41.) In *People v. Lewis* (1977), 55 Ill. App. 3d 1022, the court concluded that counsel's decision to waive the recording of final arguments was discretionary and did not mandate a conclusion that trial counsel was incompetent. (55 Ill. App. 3d 1022, 1026-27.) The court in *People v. Barbour* (1972), 5 Ill. App. 3d 323, reached the same decision despite a preference for recording final arguments. (5 Ill. App. 3d 323, 327.) In *People v. Morgan* (1981), 93 Ill. App. 3d 12, the court admonished that counsel should not waive transcription of closing arguments but nevertheless despite the defense counsel's inability to tell whether errors had occurred for purposes of appeal, concluded that there was no problem sufficient to warrant reversal. (93 Ill. App. 3d 12, 15.) In the present case, where the defendants did not, at their option, submit a bystanders' report, nor do they now designate any specific prejudice resulting from the absence of this portion of the record, we cannot determine that counsel was incompetent for failing to provide this record.

Defendants also argue that their trial counsel did not cross-examine prosecution witnesses adequately or, in some cases, at all and that what cross-examination he did was often irrelevant. They argue that

this was equivalent to not participating in the trial and that, therefore, under the rule we laid down in *People v. Coss* (1977), 45 Ill. App. 3d 539, they need not show that the outcome of their trial probably would have been different. The defendants also allege it was error for their trial counsel to fail to cross-examine defense witness Doctor Randolph simply to save time. The State notes that the defendants' counsel cross-examined each of its witnesses and suggests that nothing would have been gained from further examination of Doctor Randolph.

In *People v. Nutall* (1980), 91 Ill. App. 3d 758, where defense counsel did not cross-examine all the witnesses, the court indicated that cross-examination was important to adequate presentation of the defendant's case but found that mere conjecture or speculation as to whether the defendant would have benefited was insufficient to show inadequacy of counsel. The totality of the attorney's conduct at trial did not reflect ineffective assistance. 91 Ill. App. 3d 758, 767.

In the particular instances of which the defendants complain, it is difficult to see any rhyme or reason to their trial counsel's line of questioning. He concluded his cross-examination of Doctor Aven as follows:

"Q. Now Doctor, in the course of your study of medicine were you familiar with, in the early 30's, with the epidemic in the south with the Mulligan Stew case?

A. I am not familiar with that.

Q. In that particular instance—you are not familiar with that. All right. That's all."

Perhaps counsel was trying to impeach the doctor's professional credibility through this line of questioning. As to his failure to redirect Doctor Randolph, however, there can hardly be a strategic justification for not allowing his only defense witness, other than the defendants themselves, to explain an incomplete answer, particularly when the answer went to the apparent heart of his testimony:

"Q. Doctor, do you think Christine Berger should never attend school?

A. Beg your pardon?

Q. Do you think Christine Berger should never attend school?

A. No, I would not say she should never attend school.

[Mr. McCollum, Assistant State's Attorney]: I have no further questions, Your Honor.

[The witness]: I would like to qualify that question before I'm cut off on it.

[Mr. McCollum]: There's no question pending at this time.

[The court]: That's counsel's job. Do you have any redirect?

[Mr. Goodgold, defendants' counsel]: No, I want to cut this as short as possible. That's all, Doctor."

The entire purpose of Doctor Randolph's direct testimony as elicited by defense counsel presumably was to indicate that Christine was too ill to attend school. For defense counsel not to let him explain his answer, regarding whether she could *never* attend school, is hard to comprehend. The doctor himself asked to qualify the answer, the court specifically noted that was counsel's job, and in his answer Doctor Randolph might have expressed an opinion that Christine had indeed been too ill to attend school but could perhaps resume classes after treatment. All this is speculative, however, and again the defendants do not suggest any prejudice to the outcome but simply characterize the trial counsel's conduct as incompetent. Rather, the defendants argue that trial counsel's action was equivalent to not taking part in the trial and that, therefore, the defendants need not show that the outcome probably would have been different. They cite *People v. Coss* (1977), 45 Ill. App. 3d 539. However, in that case there was literally no participation by the trial counsel, and the total lack of representation was controlling. Here, there was certainly participation, and the appropriate approach is to see whether such participation was so inadequate as to deprive the defendants of a fair trial. It appears that the only way the trial counsel's failure to redirect would have affected the outcome is *if* the doctor had excused Christine's two-year absence due to an inability to attend and *if* the court had given Doctor Randolph's testimony more credence than the other medical testimony to the contrary, and *if* the court had then overlooked the defendants' failure to tender a proper excuse on the ground that the severity of Christine's illness justified her absence and the medical certificate, which also was not proved, was merely a formality. All this seems highly unlikely, particularly in view of the totally conjectural nature of the first premise, *i.e.,* Doctor Randolph's unheard testimony.

Finally, the defendants contend that the record as a whole reflects trial counsel's inadequate preparation for trial. They state that he was unaware prior to trial of what certain witnesses would say and what he expected to prove by them. The State notes that defense counsel cross-examined State witnesses, moved for a directed verdict, and presented evidence on behalf of the defendants. Although failure to prepare adequately for trial has been held to constitute inadequate representation by counsel (*People v. Stepheny* (1970), 46 Ill. 2d 153;

*People v. Vargas* (1981), 97 Ill. App. 3d 347, 349), in order to warrant a reversal a defendant still must establish actual incompetence as reflected by the representation which resulted in substantial prejudice. (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 21; *People v. Vargas* (1981), 97 Ill. App. 3d 347, 349.) This issue must be determined from the entire record rather than from isolated instances in the trial. (*People v. Posey* (1980), 83 Ill. App. 3d 885, 891.) Again, the defendants do not establish prejudice. They do not even designate the "certain witnesses" to which they are referring. In the case they cite to support their argument (*People v. De Simone* (1956), 9 Ill. 2d 522), defense counsel, among other things, had not interviewed defense witnesses before trial *and* their testimony was specifically found to be damaging to the defendant, which was a key factor. The defendants here simply argue a general lack of preparation and do not set forth any showing of prejudice.

■ An examination of the record reveals that the defendants' claim of incompetence is probably not far off the mark. Their trial counsel did not make a single objection during the State's case, although there were numerous instances of hearsay testimony. His cross-examinations seemed to be merely gestures and were pointless for the most part. His direct examination was ineffective in that he had difficulty in understanding and overcoming the State's objections. He exhibited an unfamiliarity with courtroom procedure. As an example, when the State asked whether he had other witnesses to testify he answered, "Unless the doctor may want to question the witnesses in open court, the child in open court. That would be the only exception." To which the court replied, "Can't conceive of that situation." Were we to determine that the defendants' trial representation must satisfy "minimum professional standards for reasonably competent representation," a standard which a number of Federal courts have adopted (see, *e.g., Cooper v. Fitzharris* (9th Cir. 1978), 586 F.2d 1325; *United States v. Bosch* (1st Cir. 1978), 584 F.2d 1113; *United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634), we would be forced to answer that he did not satisfy those minimum professional standards for reasonably competent representation. (*People v. Greer* (1980), 79 Ill. 2d 103, 121.) However, our supreme court has considered that question and rejected it, refusing to change the Illinois standard. (*People v. Greer* (1980), 79 Ill. 2d 103, 121; *People v. Murphy* (1978), 72 Ill. 2d 421.) Despite defense counsel's less than adequate conduct of the trial, no prejudice has been shown. It is up to a defendant who charges that his counsel was incompetent to establish both that incompetency and the resultant prejudice (*People v. Rettig*

(1980), 88 Ill. App. 3d 888, 890), and the charges cannot be based solely upon assertions (*People v. Ashley* (1966), 34 Ill. 2d 402, 411). Here nothing that the defendants complain of has been shown by them to have prejudiced their trial and certainly not to the extent that the outcome would have been different.

The defendants' final contention on appeal is that it was error for the trial court during the sentencing hearing to permit the State's introduction of evidence of a similar charge involving another daughter, which was then pending against the defendants. They argue that evidence of mere charges is improper and note that the trial judge did consider this evidence in determining the defendants' sentence. The State responds that the cases upon which the defendants rely are *People v. Kennedy* (1978), 66 Ill. App. 3d 35, and *People v. Williamson* (1979), 69 Ill. App. 3d 1037, whose conclusions were rejected by our court in *People v. Fritz* (1979), 77 Ill. App. 3d 1, *rev'd on other grounds* (1981), 84 Ill. 2d 72. The State urges that the evidence was presented permissibly on the question of probation and was not for consideration in determining the length of the sentence to be imposed. The State further notes that the evidence presented contains proof of the underlying criminal conduct.

In *People v. La Pointe* (1981), 88 Ill. 2d 482, the supreme court addressed the apparent inconsistencies in the appellate court districts' treatment of the admission at sentencing hearings of evidence of criminal conduct which has not resulted in prosecution and conviction. In its opinion the court states that adequate guidelines already exist in the provisions of chapter V of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, pars. 1005—1—1 through 1005—9—3), which deal with sentencing, and in the court's earlier opinions. The court specifically refers to *People v. Adkins* (1968), 41 Ill. 2d 297, for guidelines. In *Adkins*, the court emphasized that a sentencing judge has wide discretion as to sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed and that, while a judge is not limited to considering only information which would be admissible under the adversary circumstances of a trial, he must exercise care to insure the accuracy of any information considered. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 496; *People v. Adkins* (1968), 41 Ill. 2d 297, 300.) The court in *La Pointe* concluded that "[w]hether a defendant had been prosecuted and convicted for other misconduct, proof of which is offered at a sentencing hearing, is not, in our judgment, controlling as to its admissibility. More important are questions of relevancy and accuracy of the information submitted. Those questions are, of course, initially determined by the

trial judge in the exercise of an informed discretion." (88 Ill. 2d 482, 498.) The court affirmed the trial court's imposition of a natural life sentence without parole on the 18-year-old defendant and found that under the circumstances the trial judge properly received proof of criminal conduct for which no prosecution and conviction ensued. (88 Ill. 2d 482, 499.) In *People v. Brown* (1982), 103 Ill. App. 3d 306, the appellate court, following *La Pointe*, affirmed the trial court's consideration of evidence of a pending charge that had not yet resulted in conviction for the purpose of determining the length of sentence to be imposed, notwithstanding the general rule articulated in *People v. Tiess* (1981), 97 Ill. App. 3d 45, 51; 103 Ill. App. 3d 306, 310. In *Tiess*, the court found that to the extent that the defendant was seeking probation at the sentencing hearing, evidence of previous conduct, which included arrests not disposed of in conviction, was relevant to deciding whether or not probation should be granted. (97 Ill. App. 3d 45, 51.) In *People v. Fritz* (1979), 77 Ill. App. 3d 1, where the trial court, in determining fitness for probation, considered a rap sheet which listed a number of arrests with no disposition, the court said, "Mindful of the possible unfairness to a defendant in having the length of his sentence determined in part by charges not reduced to conviction, our courts have carefully limited the use of such information to the question of whether a request for probation should be granted and do not allow its use in determining the length of imprisonment." (77 Ill. App. 3d 1, 6.) In *People v. Makes* (1981), 103 Ill. App. 3d 232, where evidence of a similar offense for which no criminal charges were filed was considered at the sentencing hearing, the appellate court noted that the accuracy of the information was adequate and did not find consideration of the charges in sentencing to be error. In *People v. Poll* (1980), 81 Ill. 2d 286, which the defendants cite, evidence of pending charges was introduced at a sentencing hearing, but the trial court did not mention any reliance on that evidence, and the court, therefore, found the claim of error to be without merit. (81 Ill. 2d 286, 289-90; see also *People v. Turner* (1981), 93 Ill. App. 3d 61, 71; *People v. Mosley* (1980), 87 Ill. App. 3d 903, 905.) However, the court also stated that even had the judge considered the evidence of the defendant's pending charges, the introduction of evidence concerning those charges would not be reversible error under the circumstances of the case. (81 Ill. 2d 286, 290.) Although the circumstances of *Poll* did include evidence of several other convictions which supported the sentence, the *Poll* court cited with approval *People v. Bey* (1972), 51 Ill. 2d 262. In *Bey*, the court reaffirmed that proof of a pending indictment is properly presentable at a hearing in

aggravation and mitigation, noting that a trial court is presumed to recognize incompetent evidence and disregard it. 51 Ill. 2d 262, 267.

These cases give trial judges wide latitude in receiving evidence relative to sentencing. Proof of pending charges, of criminal conduct for which no charges were filed, and of prior arrests without disposition have all been considered at sentencing hearings without error. Although use of such evidence has sometimes been limited to consideration only in determining whether probation should be granted and not as to the length of sentence to be imposed, in light of *La Pointe* even this is not rigid. (In *La Pointe*, the trial court could not have granted probation on a murder conviction. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3(b), (c).) Therefore, the court's only consideration was determining the length of sentence to be imposed.) The more important inquiry is whether safeguards were taken to insure accuracy and whether the particular information is relevant.

In considering a grant of probation, a reviewing court may only determine whether the trial court abused its discretion in acting in an arbitrary manner. (*People v. Bolyard* (1975), 61 Ill. 2d 583, 586; *People v. Girard* (1977), 48 Ill. App. 3d 1, 3.) In the present case, charges were pending against the defendants regarding the truancy of a second daughter. Offering evidence in aggravation, the State elicited testimony from truant officer Jan Howes which tended to establish the second daughter's prolonged absence from school and her parents' knowledge thereof. In *La Pointe*, the court, in holding that there was no abuse of discretion by the trial court, noted that "[t]he conduct testified to was relevant to a determination of a proper sentence in that it bore upon the likelihood or unlikelihood that defendant would commit other offenses; it appeared trustworthy; defendant had the opportunity to face and cross-examine the witness; and the accuracy of the information was not challenged. (88 Ill. 2d 482, 498-99.) All of these factors were present in the case at issue. Consideration of this evidence was not an abuse of discretion. As the State notes, the trial judge also considered factors in mitigation and elected not to impose a fine or term of incarceration.

For the foregoing reasons, the judgments of the circuit court of Lake County are affirmed.

Judgments affirmed.

SEIDENFELD, P.J., and LINDBERG, J., concur.