THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONNIE L. STARKS, Defendant-Appellant.

Second District   No. 82—893

Opinion filed December 12, 1983.—Rehearing denied January 26, 1984.

Robert J. Hauser, of Sullivan, Smith, Hauser & Noonan, of Waukegan, for appellant.

Fred Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Ronnie L. Starks, was indicted in Lake County for the armed robbery of the Libertyville Federal Savings and Loan Association branch in Gurnee, Illinois. He was convicted by a jury and sentenced to the Department of Corrections for 11 years. The defendant filed a post-trial motion which was supplemented twice; all were denied, and he appealed.

Jalena Gutman, a teller at Libertyville Federal Savings and Loan Association branch in Gurnee, testified she was robbed at gun point about 6:30 p.m. on Friday, January 15, 1982. She identified the defendant as the robber from photos shown to her later that evening, in an in-person lineup on March 10, and in court. Her testimony was corroborated by the other teller on duty that evening, Donna Vasey. Vasey also identified the defendant as the robber from photos, the lineup and in court. The defendant did not testify, but his uncle, aunt, mother, and a friend testified that he was in East Bernstadt, Kentucky, during the period December 24 to January 20 when he was arrested by the Kentucky police. The defendant's sister also testified she phoned her mother in East Bernstadt on January 15 at approximately 4:30 p.m., Kentucky time, and that she heard the defendant's voice in the background. The defendant called one of the State's wit-

nesses, Gurnee Police Department Sergeant Sheldon, who testified that Gutman and Vasey described the robber as being six feet tall, 185 pounds, with grey or green eyes. There was no testimony at trial as to the defendant's actual physical description.

In rebuttal, the State called Karen Newman, a teller at the First Federal Bank of Chicago in McHenry. Newman was expected to testify that she saw the defendant about 6 p.m. on January 8 at that bank. However, at trial, she was unable to recognize the defendant as the man she saw that evening. Diane Gatham, who attended some of her high school classes with the defendant and whom she had known for about 10 years, testified she saw the defendant at the J & L gas station in Island Lake on either Sunday, December 27, 1981, or Sunday, January 3, 1982. She observed him for about three minutes while she was stopped in traffic waiting to make a left turn. She saw him walk toward a green El Camino or Ranchero, which the witness identified as being Bill Dotson's, whom she stated was somehow related to the defendant. She observed the defendant get in the passenger side of the car; she did not identify Dotson as the person driving the car. Gatham testified she later informed her husband, who was an Island Lake police officer, that she had seen the defendant, and he called that information in to the police department. Gatham also testified a woman she worked with, Bernice Woods, drove with the defendant's sister-in-law, and that Bernice mentioned she had seen the defendant sometime after the date Gatham had seen him.

During the defendant's surrebuttal, Bernice Woods denied telling Gatham she had seen the defendant or had any knowledge of him having been in the area.

The jury found the defendant guilty of armed robbery and the trial court entered judgment on the verdict.

Defense counsel filed a post-trial motion, which was later supplemented by additional, newly retained counsel for the defendant, Robert J. Hauser. The supplemental motion for new trial identified seven additional alibi witnesses and their affidavits were attached to the motion. The motion also alleged that the defendant submitted himself to a polygraph examination upon representation by the Lake County State's Attorney's office that the charge would be dismissed if the defendant passed the test. The motion alleged the defendant passed the test, but that the State's Attorney's office reneged.

Hauser filed another supplement to the post-trial motion, alleging that the defendant's appointed counsel at trial, Randall Stewart, failed to provide the defendant with effective assistance of counsel due to Stewart's failure to call or take evidence depositions of all wit-

nesses available for his defense, specifically the seven previously noted witnesses and, in addition, Bill Dotson and Stefan Urban. It was also alleged that the defendant was not adequately advised of his right to testify at trial.

After entry of the judgment on the verdict on July 1, 1982, the trial court held a hearing on August 24 at which Hauser was permitted to examine Joseph Wayne Feekes, whom defense counsel had reason to believe had robbed the savings and loan rather than the defendant. However, upon examination, Feekes denied that he had previously admitted to the FBI that he was involved in a bank robbery in Lake County, and neither Jalena Gutman nor Donna Vasey recognized Feekes as the robber. A third person present at the savings and loan when it was robbed was a customer, Stefan Urban. Urban had been unable to identify Starks as the robber from photos shown to him earlier. Urban was also unable to identify Feekes as the robber after viewing him in the courtroom.

The trial court heard arguments on trial counsel Stewart's original post-trial motion and Hauser's argument concerning additional alibi witnesses and the alleged polygraph agreement between the State's Attorney and the defendant. Hauser was also permitted at that time to examine Bill Dotson, who owned the El Camino in which Diane Gatham stated she saw the defendant on either December 27 or January 3. Dotson denied he saw Starks during the period in question, but stated that another friend of his from Texas was staying with him at that time, and may have been the person Gatham observed at the J & L gas station. Hauser also indicated he had an affidavit from Susan Starks, the defendant's ex-wife, regarding her regular telephone contact with the defendant in Kentucky during the period testified to by Diane Gatham. After argument, the trial court denied the motion. Sentencing was continued to permit counsel an opportunity to discuss the defendant's presentence report with him due to the defendant's illiteracy.

On the date set for sentencing, Hauser was further allowed to make a record concerning Stewart's representation of the defendant at trial. Hauser presented testimony from Betty Dotson, the defendant's sister, that she had advised Stewart of all the witnesses who could testify for the defendant and provided him with their affidavits prior to trial. She stated Stewart advised her there were limited funds for witnesses and that she would have to get them up to Illinois. She did, in fact, drive the witnesses who testified at trial up from Kentucky in her van and they stayed at her home. Susan Starks, the defendant's ex-wife, then testified she spoke with the defendant in

Kentucky on January 3, 11, 12 and 16, as stated in her previously filed affidavit. She testified she was not contacted before trial by anyone representing the defendant.

Finally, the defendant testified he was interviewed by Stewart only three times, the first of which interviews was merely to advise him that Stewart had been appointed to represent him. The defendant referred Stewart to his sister, Betty Dotson, for the names of witnesses. The defendant told Stewart at the start of trial that he would testify if either he (Stewart) or the State's Attorney wanted him to. He could not recall if Stewart told him the State's Attorney could not call him to testify; in any case, Stewart advised against his testifying in light of his past record.

The defendant testified about the polygraph agreement also:

"Q. [Hauser] And on what basis did you take that polygraph examination? What was your understanding if you passed it?

A. [Starks] The understanding that I had got from him, that the State told him if I passed the polygraph test they would drop the charge.

Q. So you went ahead and took it?

A. Yes, sir, and they said that I, you know, for the line-up, for the line-up, too.

Mr. Hauser: All right, I have nothing more."

On cross-examination, the defendant was asked, and answered, as follows:

Q. [Assistant State's Attorney Briscoe] He also went over your rights with you?

A. [Starks] What do you mean?

Q. I mean, he talked to you about pleading guilty or going to trial?

A. Yes.

Q. So you were aware of all of that?

A. Yes.

Mr. Briscoe: Nothing further."

The defendant further testified in return for a guilty plea, the State offered him six years concurrent with the six years he already had on burglary in McHenry County. The defendant declined the offer because "[he] didn't do it."

The defendant's post-trial motions were denied and he was sentenced. The three issues he raises on appeal are:

1. Whether the defendant was denied the effective assistance of counsel.

2. Whether the defendant was denied a fair trial due to the

admission of evidence of other offenses.

3. Whether the State reneged on an agreement to dismiss the charge.

### 1. ASSISTANCE OF COUNSEL

The defendant asserts that his appointed trial counsel, Assistant Public Defender Randall Stewart, was incompetent and that, absent that incompetence, the outcome of his trial would probably have been different. We disagree.

■ The often-stated two-part test for establishing the incompetency of counsel which would warrant a new trial is whether counsel was actually incompetent, as reflected in the performance of his duties as trial attorney, *and* if that incompetence produced substantial prejudice to the defendant without which the result of the trial probably would have been different. (*People v. Rodriguez* (1983), 117 Ill. App. 3d 761; *People v. Lewis* (1981), 88 Ill. 2d 129; *People v. Carlson* (1980), 79 Ill. 2d 564.) It is the defendant's burden to establish clearly the incompetency and the resultant prejudice. *People v. Martin* (1983), 112 Ill. App. 3d 486.

The defendant specifically charges his counsel was incompetent in the following respects: (1) by interviewing the defendant only three times prior to trial; (2) by failing to contact or subpoena all of the witnesses who would testify the defendant was in Kentucky on January 15; (3) by relying on the defendant's sister to transport and house the witnesses from Kentucky; (4) by not taking evidence depositions; (5) by not interviewing or subpoenaing witnesses in Illinois; *i.e.*, Susan Starks, the defendant's ex-wife, Bill Dotson, the owner of the El Camino which Diane Gatham testified the defendant entered at the J & L gas station on either December 27 or January 3, and Stefan Urban, the customer present when the robbery occurred; (6) by not preparing the defendant for testimony; (7) by intimating the defendant had a prior record by questioning the two tellers about seeing photos of the defendant the night of the robbery; (8) by not objecting to testimony of Sergeant Sheldon concerning his presence at an interrogation in McHenry County at which the defendant was present; (9) by not preparing the defendant's mother before her testimony so as to avoid her mentioning that the defendant was arrested "for two robberies" and by not attempting to mitigate the effect of such testimony by a motion for mistrial or introducing evidence that the defendant was no longer a suspect in the second robbery; (10) by failing to object or move for a mistrial after the prosecutor questioned Bernice Woods on cross-examination concerning whether the defend-

ant was involved in the beating of her son 10 years earlier; (11) by failing to subpoena a witness from Illinois Bell in order to substantiate defendant's sister's January 15 call to Kentucky during which she heard the defendant's voice in the background; and (12) by failing to introduce evidence as to the defendant's actual height, weight and eye color in light of the witnesses' testimony that the robber was six feet tall, about 185 pounds, and had green or grey eyes, whereas the defendant was 5 feet 8½ inches tall, weighed 156 pounds, and has blue eyes.

It is well established that a review of competency will not be appraised on the basis of matters involving the exercise of judgment, discretion, or trial tactics. (*People v. Greenlee* (1976), 44 Ill. App. 3d 536; *People v. Newell* (1971), 48 Ill. 2d 382.) It has been held that a defendant is entitled to competent, not perfect representation. (*People v. Berland* (1978), 74 Ill. 2d 286, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 64.) Whether to present certain witnesses or whether to make objections during trial are strategic and tactical decisions which will not be reviewed. (*People v. Greer* (1980), 79 Ill. 2d 103, 121-23.) However, in *Greer*, it was stated:

"The failure to interview witnesses may indicate actual incompetence (*People v. Witherspoon* (1973), 55 Ill. 2d 18), particularly when the witnesses are known to trial counsel and their testimony may be exonerating (*People v. Stepheny* (1970), 46 Ill. 2d 153)." *People v. Greer* (1980), 79 Ill. 2d 103, 123.

■ Counsel's failure to personally interview all of the witnesses suggested by the defendant's sister or to call them as witnesses at trial was not incompetence. Defendant's sister testified she provided counsel with affidavits of these witnesses prior to trial. Consequently, their potential value as witnesses was known to counsel, and his decision not to follow up on them was a matter of strategy. No prejudice to the defendant is evident as a result of counsel's decision. A review of the affidavits of these potential witnesses shows their testimony would be cumulative, at best, of the testimony which was given by the five alibi witnesses presented at trial on the defendant's behalf. (*People v. Hebein* (1982), 111 Ill. App. 3d 830; *People v. Haywood* (1980), 82 Ill. 2d 540.) As noted by the State, more witnesses would not have necessarily increased the credibility of the ones who testified, particularly since several of the witnesses not called were either related to the defendant, had the same surname as another witness, or their testimony would not have established the defendant's presence in Kentucky on the date in question.

With regard to counsel's failure to present Bill Dotson as a wit-

ness, Diane Gatham's unarguable ability to recognize the defendant refutes the suggestion that Dotson's testimony would have been favorable and important to the defense. First, Dotson was a shirttail relative of the defendant, and second, Dotson's testimony would likely not have impeached Gatham's placement of the defendant in Island Lake on December 27 or January 3; rather, only her testimony that the car was Dotson's. She did not testify how she knew it was Dotson's car, nor did she testify that Dotson was the driver of the car.

Likewise, counsel's decision to query the two tellers with regard to the photos they had viewed of the defendant, to not object to Sheldon's testimony regarding his presence at an interrogation in McHenry County at which the defendant was present, and to not further question the defendant's mother so as to clarify her comment about the defendant's arrest for two robberies, were all matters of professional judgment and trial strategy. Whether the jury inferred prior or other criminal conduct by the defendant as the result of these asserted failings of defense counsel is purely speculative. Counsel's decision—although perhaps unwise—to suggest during cross-examination of the two tellers that they had been unduly influenced by being shown photos of the defendant prior to the lineup and their in-court identification of the defendant was undoubtedly an attempt to weaken the credibility of their positive identification of the defendant. Counsel's tactical decision not to object to the prosecutor's examination of Sergeant Sheldon concerning the defendant being in McHenry County was not unsound, considering the thrust of the prosecutor's examination was not to show the defendant was in custody, but to establish when and where Sheldon took a picture of the defendant sporting a "large growth of whiskers on his face, like a small beard, and a mustache starting." That description of the defendant as he appeared on January 27, when Sheldon took the picture, comports with the tellers' description of the robber's three-four days' beard growth on January 15. With regard to the defendant's mother, she was simply telling the truth about the arrest, and although defense counsel probably would have wished no reference had been made to the other robbery which was subsequently dismissed, counsel's passing over this remark—whether intentional or not on his part—at least may be construed as an attempt to prevent the jury from focusing any further on her comment. Additionally, no amount of pretrial witness preparation can assure that the witness will not innocently—truthfully—blurt out some information that disserves the case.

Defense counsel's decision not to call Stefan Urban as a witness was a strategy decision. Urban, the customer present during the rob-

bery, only saw the robber for two to three seconds and was unable to identify either the defendant or, during the post-trial hearing, the suspect Feekes, as the robber. Urban's opportunity and ability to have observed and recalled the physical characteristics of the robber was considerably less than that of the two tellers whose attention was focused on him longer, and whose note of details about persons who were not regular customers was deliberate and studied. Moreover, although there were discrepancies between the tellers' descriptions of the robber and the defendant's actual physical dimensions, the jury was able to observe the defendant in person and to draw its own conclusions as to how serious those discrepancies were. A crime victim's failure to accurately guess a person's height and weight is rarely fatal to the victim's otherwise positive identification of a defendant. *People v. Nelson* (1982), 106 Ill. App. 3d 838, 844.

■ Finally, as the State points out, the defendant stated Stewart "recommended" he not testify because of his past record, and that Stewart "probably" advised him that the State's Attorney could not call him to testify. Based on the record, it appears the defendant acceded to his counsel's recommendation that it "wouldn't be wise" for him to testify. The defendant stated to counsel he "didn't know nothing about [the robbery] because [he] was nowhere in the State at the time." The defendant further stated: "I told [counsel] that my sister had all the names of the people for my witnesses, and I referred him to her." Such comments do not indicate the defendant desired to testify in his own behalf. Apparently, the only testimony the defendant could have offered in his own behalf would have been cumulative of the alibi witnesses, and his testifying would have subjected him on cross-examination to exposure of his past criminal conduct about which the jury would then have no need to speculate.

■ In sum, whether counsel was incompetent must be assessed on the basis of the entire record, and not isolated instances during trial. (*People v. Berger* (1982), 109 Ill. App. 3d 1054.) Defendant here has failed in the first instance to show that Stewart was incompetent. Consequently, defendant was not deprived of the effective assistance of counsel, and the trial court properly denied the defendant's motion for a new trial on that basis.

### 2. ADMISSION OF EVIDENCE OF OTHER OFFENSES

The defendant contends he was denied a fair trial due to the prosecutor's improper elicitation of evidence of other crimes committed by the defendant. His contention is without merit.

Specifically, he complains about the propriety of the prosecutor's

direct examination of Sergeant Sheldon wherein defendant's presence in the McHenry County Jail interview room on January 27, 1982, was established. He contends this reference allowed the jury to speculate as to what crime or crimes the defendant may have committed that would have resulted in his incarceration in McHenry County. Similarly, the defendant claims the prosecutor's calling of Karen Newman in order to establish defendant's presence on January 8, 1982, in the McHenry County bank in which she was a teller improperly caused the jury to speculate that the defendant had indeed participated in the second robbery to which his mother had alluded. Finally, the defendant complains the prosecutor's cross-examination of surrebuttal witness Bernice Woods concerning a prior incident in which her son was beaten up by several persons improperly intimated the defendant's participation in past misdeeds.

■ This argument was not preserved as error through objection or post-trial motion and, thus, any error has been waived. (*People v. Jackson* (1981), 84 Ill. 2d 350.) However, this court will exercise its discretionary power to consider the merits of issues that technically have been waived in light of the allegations of incompetency of counsel in this case. 87 Ill. 2d R. 615(a).

■ At the most, the instances cited by the defendant amount to references to his possible involvement in other, unrelated offenses. In such cases, it has been held that a conviction will not be reversed unless it appears that real justice has been denied or that a jury verdict may have resulted from such error. *People v. Crotty* (1976), 44 Ill. App. 3d 413, 419.

In the case at bar, it is significant that there was a valid purpose for the questions in each of the three instances. Although Newman ultimately did not identify the defendant as she was expected to, she was cautioned against making any reference to the fact that she was being robbed at the time she allegedly encountered the defendant and, in fact, her testimony was intended to rebut the defendant's alibi defense by establishing that he was present in Illinois on January 8, 1982. When Newman did not recognize the defendant in the courtroom, defense counsel objected to a further question asked by the prosecutor, the court sustained the objection, and the witness was promptly excused.

The questions asked of Sergeant Sheldon were appropriate to establish the foundation for the introduction of the photo taken by Sergeant Sheldon of the defendant on January 27. Whether the jury drew the inference suggested by the defendant here is purely speculative. Numerous inferences might have been drawn by the jury as the

result of Sheldon's testimony; *e.g.*, that McHenry County facilities were more suitable for some reason than Lake County, that the defendant was providing McHenry County authorities with information helpful in an investigation of someone other than himself, etc. Inferences as diverse as the jury itself could have been drawn, some of them perhaps even favorable to the defendant in that he might have been viewed as having been cooperating with another law enforcement agency.

In the third instance, the prosecutor's questions to Bernice Woods could have exposed that she had some bias, interest, or motive for testifying which would not have been obvious to the jury. Exposure of a witness' ulterior motivation for testifying is properly within the scope of cross-examination. Further, the incident in question was remote, and Woods denied that she knew the defendant was one of the persons who beat up her son, or that she was afraid of him.

Whether the jury in fact interpreted any of these three specified instances as evidence of other criminal conduct on the part of the defendant is conjecture. In our opinion, the prosecutor had a valid reason in each instance for treading so close to such potentially prejudicial material, and we do not believe his "duty *** to safeguard the rights of all the people," including the accused, was breached thereby. *People v. Gregory* (1961), 22 Ill. 2d 601, 604.

On the basis of the record, it does not appear that evidence of other offenses was improperly admitted. Consequently, no reversal on this basis is warranted.

### 3. THE PRETRIAL AGREEMENT

■ The defendant contends the Lake County State's Attorney agreed to dismiss the charge against him if he took and passed a polygraph examination. He did take one on March 30, 1982, and, according to his supplemental post-trial motion, he passed it. Although the State suggests the agreement was also conditioned on his successful participation in a lineup, the sequence of events does not appear to support this theory. The lineup at which the defendant was identified by the two tellers was conducted on March 10, and the court's order that the defendant be transported to the Libertyville Police Department for the polygraph examination was filed on March 16. That order was entered on motion of the defendant's counsel Stewart. If successful passage of both the lineup and the polygraph were conditions of the agreement and the defendant failed the first, there certainly would be no need to proceed with the polygraph. After the polygraph examination on March 30, the next reference in the record to it is on

June 29, after the jury was sworn in, when the State made a motion *in limine* to bar any reference during trial to the polygraph examination in light of "the recent case." (Referring, we believe, to *People v. Baynes* (1981), 88 Ill. 2d 225.)

The court granted the motion, and told the defendant:

> "THE COURT: What has occurred here is, they have asked that everybody be precluded from talking about a lie detector test, okay. Our Supreme Court has said a lie detector test is not evidence in a case, and in any case, and even if the parties agreed that it's going to be evidence in the case, it can't be evidence in the case, and therefore, you are precluded from ever mentioning that as evidence; and I would just tell you, and I will caution Mr. Stewart, and neither you nor any of the witnesses can testify about the fact there has been any polygraph or lie detector evidence, do you understand?

> THE DEFENDANT: Yes."

During the post-trial hearing concerning this issue, the court may have misapprehended the thrust of counsel's argument and, therefore, did not fully consider whether the defendant was entitled to relief. The defendant's point was not that the favorable results of the polygraph examination should have been allowed in evidence—clearly that would not have been permissible; rather, that the defendant gave up his right against self-incrimination in reliance upon the promise of the State's Attorney to dismiss the charge if he passed the examination.

However, the record here is not complete enough to allow the conclusion that there was, in fact, an agreement or if there was what its terms were. The defendant has failed to show us evidence which would support his argument on this issue. He, therefore, cannot sustain his position and no reversal is therefore mandated.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

HOPF and REINHARD, JJ., concur.