THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARIO GUAJARDO, Defendant-Appellant.

First District (2nd Division)   No. 1—90—0029

Opinion filed May 17, 1994.—Rehearing denied June 21, 1994.—Modified opinion filed June 28, 1994.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Tyra Taylor-Bell, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

Following a jury trial, defendant Mario Guajardo was convicted of aggravated criminal sexual assault (Class X), two counts of criminal sexual assault (Class 1), and aggravated criminal sexual abuse (Class 2). He was sentenced to imprisonment for 18 years. On appeal, he raises issues of improper admission of hearsay evidence, improper closing argument on the part of the prosecution, and violation of the one-act-one-crime doctrine; he also challenges his sentence. For reasons that follow, we affirm in part, vacate in part, and remand for action consistent with this opinion.

Defendant was charged with sexually assaulting minor J.S. on or about December 23, 1987. Prior to his October 1989 trial, the court held a hearing pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10 (now 725 ILCS 5/115—10 (West 1992))), which became effective on January 1, 1988. The court heard defendant's arguments regarding limiting the testimony of three prosecution witnesses. The issues discussed included hearsay statements, applicable exceptions, and the extent of descriptive testimony where a witness was allowed to testify. The circuit court contacted Springfield for legislative history on the issue of whether details of the assaults could be repeated by outcry witnesses. The court concluded that the legislature intended to expand the perimeters of the hearsay exception to allow witnesses to identify defendants and include facts of the assault in their testimony. It outlined the requirements and restrictions of an evidentiary hearing and determined which witnesses would be required to testify. The court heard argument as to whether the victim's mother, Judy S., could testify under the admission exception regarding statements made to her by defendant, ruling that she could because defendant's acts and deeds could be construed as an admission. The court also made its ruling subject to change if defendant could produce case law stating that an admission had to be unequivocal.

On October 18, 1989, a jury was empaneled. The next day, outside the presence of the jury, the court held an evidentiary hearing for

potential witness Tarik Dwiek. Dwiek testified that he was 15 years old and that his grandmother lived in the apartment above the juvenile complainant, J.S., on 72nd Street in Summit. J.S. lived with his mother, defendant, and his twin sisters in the downstairs apartment. Dwiek identified defendant in court.

Dwiek stayed with his grandmother over the Christmas holiday in 1987. On one afternoon, on or near Christmas day, he and J.S. talked and played board games in the grandmother's living room, while she slept. Dwiek saw a piece of mail addressed to defendant on the coffee table, and told J.S. that the mail belonged downstairs. Dwiek "asked [J.S.] how he liked [defendant], if he was cool." J.S. then made statements implicating defendant.

On cross-examination Dwiek stated that J.S. told him "he didn't like [defendant] very much." He told Dwiek that "he didn't like [defendant] because he made him suck his pecker." Dwiek told J.S. to tell his mother.

The circuit court found Dwiek to be a reliable witness and stated that 13-year-old boys do not keep diaries. The date provided by Dwiek was sufficiently close in time and place in relationship to the event charged, and Dwiek's statement was reliable.

The court also examined J.S. outside the presence of the jury. J.S. stated that he was nine years old and attended the fourth grade at Wilkens Grammar School. He understood the difference between the truth and a lie, and knew that if he lied he would get into trouble. He also knew that the prosecutor was there to help him, and that defense counsel was there to help defendant. The court found J.S. competent to testify.

Following opening statements, J.S. testified for the State. He was nine years old, and in 1987 he had been seven years old and in the second grade. He lived in Summit, Illinois. In 1987 he lived with his mother, twin sisters, and defendant, whom he identified in court.

On December 23, 1987, defendant picked him up at about 8 p.m. and drove him to a nearby Zayre store to buy a present for his friend Connie Alousch. J.S. stated:

> "[Defendant] stopped the car and we were on a stop sign, I mean stoplight, and he took out his pecker and he said, 'Do you want it?' And I said, 'No,' and he pulled my hair and started—he pushed—he pushed it on it and he moved my head up and down and then he said, 'Yeah,' and then we drove to Zayre."

J.S. clarified the term "pecker" to mean penis.

J.S. was unsure how long the incident took, but he remembered it happened in the car. He was sitting with his head over defendant's penis. Following the incident, defendant dropped J.S. off at home.

There was another incident involving defendant that took place in J.S.'s mother's bedroom, where defendant "put white stuff in [J.S.'s] mouth." The "white stuff" came from defendant's penis. Defendant told J.S. that the incident was to be a secret.

There were five or six other such incidents as well. Defendant once told J.S. to kneel down while in the bathroom, and asked him, "Do you want it?" When J.S. replied that he did not and moved backwards, defendant "pulled [him] back by [his] head and he put—pushed [his] head on to it." There was no semen during that incident.

Another incident occurred when defendant was sitting on the couch in his shorts and J.S. went into the living room to watch television. Defendant again asked J.S., "Do you want it?" J.S. answered no, and defendant pushed J.S.'s head down towards his penis and told J.S. to "lick it like it was a lollipop."

J.S. told Dwiek about the incidents. He told Dwiek, "I don't like [defendant] anymore because he made me suck his pecker." J.S. told Dwiek instead of his mother because she often took defendant's side in disagreements between them. Shortly after he told Dwiek about the latest incident, J.S. told his mother. When J.S. told his mother, she called and told defendant that J.S. "wouldn't do it anymore." Defendant then came to the house, J.S. told him that he "wouldn't do it anymore," and J.S. ran to his room.

Although J.S. no longer trusted defendant, they had gotten along well in the past. On the day he told his mother about the incidents, he talked to the police. Later that day he went to the hospital and stayed there for two months.

On cross-examination, J.S. stated that he did not tell two of his friends about the incidents because he did not share secrets with them. He later told another friend, Tony, with whom he does share secrets. His mother had slapped him once when he lied, and she had hit him once on the behind with a curtain rod. Those two punishments were the most physical his mother had ever administered. The hit on the behind with the curtain rod was at least two years prior to the incidents involving defendant.

The last incident occurred on December 23, 1987, and J.S. told Dwiek about it a few days later. J.S. further described how defendant had lain on top of him and "stuck his pecker up [his] butt" while J.S. was lying on his mother's bed. It made him cry, but he could not remember any pain and did not remember if his "butt" was sore the next day. Defendant had once made him "suck his pecker" while J.S.'s mother was on the telephone talking to his grandmother.

When defendant put J.S.'s head on his pecker in the car, there were other cars around; defendant had repeated the act while in the

store parking lot. Prior to telling his mother about the incidents, she had taken defendant's word over his own where their two stories conflicted, and he was punished. This was the first time his mother believed him over defendant. When he told her about the incidents, he told her everything.

When questioned about baths he used to take with his friend Tony, J.S. stated that he always did so, and that they played with their "He-Man" toys together. They did not touch one another, but simply played in the tub.

On redirect examination, J.S. explained that he was five or six years old when he took baths with Tony, and that they played in the bathtub. The prosecutor had told him to tell the jury that defendant frequently hit him and his mother, and that he was afraid to tell his mother because defendant had a gun and always hit him on the back of the head. He was also told to stay calm and tell the truth.

At first he did not know what was happening to him, because he was young and didn't know what defendant was doing. He never fought defendant because defendant was bigger than he was.

Dwiek testified that he was 15 years old, and that in 1987 he spent most of his Christmas vacation with his grandmother. He and J.S. played board games and talked. He asked J.S. whether he liked defendant, "if he was cool." J.S. told him that "he didn't like him because he made him suck his pecker." Dwiek told J.S. to tell his mother.

On cross-examination Dwiek stated that J.S. was like a little brother to him. He was afraid for J.S. and believed him because a "little kid like that wouldn't tell a lie like that." He did not tell his grandmother because he felt it was best that J.S. tell his mother.

Judy S., J.S.'s mother, testified that she had lived with defendant for two years. Her twin daughters turned eight months old in December of 1987. The day of the incident complained of, defendant took her to work in his car and offered to take J.S. to buy a Christmas present for his friend Connie. Later defendant picked her up from work and told her J.S. had bought a stuffed animal for Connie at Zayre.

She had noticed her son exhibiting unusual behavior for a little over a year, beginning three or four months prior to her pregnancy. He was despondent, his grades were sporadic, and he followed his teacher around and wanted to sit close to her. Prior to this behavior, he had earned straight A's in school. He also had nightmares, complained he did not feel well, and wanted to quit playing soccer.

On January 10, 1988, at about 7 p.m., she was in her living room and Connie Alousch, who was living upstairs, told her J.S. had

something to tell her. A few minutes later, he came downstairs and told her that "he didn't want to do it anymore." He told her that he did not want to have "to put [his] mouth on [defendant]'s pecker anymore." He then told her about the incidents and told her he was scared.

She told J.S. that they would go to the police, she called a sitter for the twins, and told J.S. to put on a shirt. Defendant then called her, because they had plans to go to the movies, and she told him she was not going. She further told him not to "step foot" in the house. She told defendant that J.S. had told her everything. Defendant repeatedly said, "[J.S.]'s a liar." Then he said, "What did he say, he's lying."

J.S. then came into the room and said, "Ma, I'm not lying." She handed him the phone and he told defendant, "I told my mom, I told her everything and I'm not going to have to do it anymore." She hung up the phone and prepared to go to the police station. Defendant then opened the door of the apartment with his key, and she blocked the doorway. Defendant told J.S. to tell his mother he was lying. She told J.S. to run, and then struggled with defendant to keep him from going farther into the house. She told him to leave and that the sitter was bringing the police.

Defendant went down on his knees and looked up at her and said, "Jude, don't do this to me, please, Jude, don't do this to me. It will kill—when I think about my family, it will kill my grandmother." She described defendant as teary-eyed, emotional, upset, scared, and sober. She asked defendant how he could do this to her. Defendant then said, "Anything that I could say, anything that I could say wouldn't make any difference, please don't do this to me, my family, think about my family." When the babysitter arrived, defendant left through the front door.

Later the same day, defendant called Judy S. while the police were in the house and told her he would leave the State and move to Texas. He would send her money if she would not go to the police. She never told defendant any details of J.S.'s statements, just that he "had told her everything."

On cross-examination, Judy S. stated that although she met defendant when she was working as a bartender when she was 17 years old, she had worked as a legislative correspondent on Capitol Hill. The last time she had tended bar was $2^{1}/_{2}$ years ago. Defendant was married when she began her relationship with him in 1985, and she had never been married. She and defendant fought frequently, but she did not fight with her son because she was his mother.

She had reprimanded J.S. with spankings or with having him

stand in the corner. Once while hanging curtains she had swatted him with a curtain rod because he continued bothering the curtains, about which he had been repeatedly warned, and almost knocked down the ladder. She reprimanded him only when necessary.

J.S. was allowed to come into her bedroom only when she and defendant were talking, sleeping, or reading. He never witnessed intimate relations between herself and defendant.

She had usually believed defendant when there were different stories from him and J.S., because defendant was the adult. She began believing J.S. when defendant slapped his face hard enough to turn it red, but J.S. did not change his story to agree with defendant. On another day, she had heard defendant use profanity toward J.S., and when she confronted him on the issue he denied the accusation.

She had not checked J.S.'s anal area because at that point she only knew about the oral incidents. The reason she did not leave immediately for the police station was that she needed to wait for the babysitter to arrive. It was necessary for her to work to pay the bills, since defendant was unemployed for most of the two years they lived together. Defendant's actions toward her son hurt her. She reported to the police that defendant offered her money not to pursue the case against him. At her request, an officer spoke to defendant about calling her home.

Dr. Sonia Yballe gave medical testimony for the State. She testified that she was a board-certified child psychiatrist. The court accepted her as an expert witness. J.S. was her patient in 1988. Following a psychiatric interview with him, she found that he suffered from severe anxiety, depression, an inability to sleep or concentrate, agitation, and deterioration in overall functioning. These are symptoms indicative of post-traumatic stress disorder. He was hospitalized at Mount Sinai Hospital for a five-day evaluation and was then held in the children's psychiatric program for two months. Post-traumatic stress disorder can be brought about by sexual abuse, and it is common for children to delay reporting such abuse.

On cross-examination, Yballe testified that she was J.S.'s primary doctor, although her program takes a team approach to patient care. She remembered treating him. All of J.S.'s symptoms were written in his chart, and those symptoms indicated that he suffered from post-traumatic stress disorder. She conceded, however, that she did not remember ever writing down that J.S. had post-traumatic stress disorder, nor did she ever write down that J.S. was sexually abused. J.S.'s symptoms differ from a general anxiety disorder. "The deterioration in school performance was caused by his depression and anxiety. The anxiety and depression was caused by the stress

factor that he had experienced." J.S. suffered definite depression as a result of sexual abuse. Yballe testified that she believed J.S. was sexually assaulted, and that her opinion was based upon his behavior, symptoms, and statements. She recalled that J.S.'s mother was extremely angry, hostile, and bitter. Following her testimony, the State rested.

Defendant testified on his own behalf. He was 33 years old, and at the time of trial lived in Summit with his wife and four children. He was married at the time he met Judy S., and she told him she was in the process of divorcing her husband. When his wife found out about their relationship, he moved in with Judy S. His relationship with J.S. deteriorated as he spent more time with Judy S.

Defendant found J.S. lying on top of his friend Tony in bed naked. Judy S. hit J.S. with a curtain rod because of this incident, and defendant had to stop her from beating J.S.

On December 23, 1987, Judy S. told him to take J.S. shopping, which he did. Nothing out of the ordinary happened. The Sunday following New Year's Day, Judy S. confronted him with the supposed sexual assault on J.S. Judy S. called him at his mother's house, and told him "this and that" about what J.S. had told her. She called him a "coldhearted bastard," and asked what he had been doing with her son. She had heard that he had made J.S. "suck [his] pecker."

Defendant told her to call the police and went over to the house. Judy S. attempted to block his entrance, but he went inside and picked up one daughter. He denied saying that he would be a disgrace to his family, but admitted saying, "Anything I say won't matter." Defendant called J.S. a liar. He turned himself in to avoid being arrested in front of his children.

The parties stipulated that Mohammad A. Tahir, a forensic scientist, would have testified that a "Vitullo" kit completed June 16, 1988, six months following the last alleged assault on J.S., which included swabs seeking blood or sperm, were negative. The defense then rested.

The court held a jury instruction conference, and the parties made closing arguments. The court instructed the jury. Defendant was found guilty of aggravated criminal sexual assault, aggravated criminal sexual abuse, and criminal sexual abuse. The jury was polled and discharged.

On November 9, 1989, defense counsel requested defendant's bond be exonerated for payment for services. On November 21, 1989, Judy S. stated in court that defendant's family and friends were threatening her at home and shouting at her in court.

On December 5, 1989, the court heard defendant's motion for a

new trial and denied it. Following evidence presented in aggravation and in mitigation, defendant asked the judge to look at his young daughter and other children, in order to bolster his request for leniency in sentencing. The judge stated:

"[T]he jury came to the conclusion that you have committed the offense by taking advantage of your position as an adult and in sort of a surrogate parental authority in which you abused the seven-year[-]old boy. This you did, in the jury's findings to satisfy your own desires and wants. I concur with the jury's finding in this particular case, and I think that they rendered the correct verdict from the evidence that I heard."

The court noted that defendant had no prior convictions, and that although defendant had not threatened J.S., he imposed serious mental and possibly physical harm upon him. The court also noted that although defendant qualified for an extended term, it would not be imposed in this case. Defendant was sentenced to 18 years in the Department of Corrections, based upon the aggravated criminal sexual assault conviction. He was also ordered to pay $750 restitution to J.S. The remainder of the bond refund was issued to defendant's attorney. Defendant now appeals.

# I

Defendant first asserts that where the court failed to conduct a hearing pursuant to section 115—10 of the Code of Criminal Procedure concerning hearsay statements made by J.S. to his mother, Judy S., and where the court, although holding a hearing concerning statements made to Tarik Dwiek, wrongly found the statements reliable and admissible, the court improperly admitted hearsay evidence that J.S. complained that defendant had made J.S. "suck his pecker." The State responds that the court held an evidentiary hearing regarding the testimony of Judy S. and that her testimony was properly admitted. The State also asserts that the court properly held that Dwiek's statements contained sufficient indicia of reliability for admissibility at trial or, in the alternative, that any error in their admissibility was harmless because they contained only one sentence by J.S., he testified to the information at trial, and he was cross-examined.

Section 115—10 of the Code of Criminal Procedure of 1963 provides the following exception to the hearsay rule for child victims of sexual abuse:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961[, criminal sexual assault, aggravated criminal sexual

assault, criminal sexual abuse, and aggravated criminal sexual abuse,] the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another;

(2) testimony of an out of court statement made by such child describing any complaint of such act *** which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) the child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1989, ch. 38, par. 115—10 (now codified as 725 ILCS 5/115—10 (West 1992)).

## A

The reliability hearing focuses on the timing, content, and circumstances when the child victim made the statements. (*People v. Back* (1992), 239 Ill. App. 3d 44, 52-54, 605 N.E.2d 689, *appeal denied* (1993), 151 Ill. 2d 567, 616 N.E.2d 338.) Actual testimony of the child at the reliability hearing is not necessary to enable the judge to evaluate whether there were sufficient safeguards of reliability when the statements were made. (*Back*, 239 Ill. App. 3d at 54.) The "proceeding" at which the child victim testifies, as contemplated by the legislature, and evident from the purpose of the reliability hearings, refers to trial proceedings, not the reliability hearing. (*Back*, 239 Ill. App. 3d at 54.) It can be determined that a witness' testimony contains sufficient indicia of reliability without a hearing at which the witness testifies.

In *People v. Moss* (1993), 260 Ill. App. 3d 272, the circuit court allowed the prosecutor to provide offers of proof regarding what the witnesses would testify to, and the court's subsequent finding that this testimony indicated sufficient reliability was affirmed on appeal. (*Moss*, 260 Ill. App. 3d at 280-81.) The court noted that the statute does not define the word "hearing," but that the term is generally understood to mean a " 'judicial examination of the issues between the parties, whether of law or of fact.' " *Moss*, 260 Ill. App. 3d at 280 n.1, quoting *Matthews v. Weiss* (1958), 15 Ill. App. 2d 530, 532, 146 N.E.2d 809, citing *Anthony v. Gilbrath* (1947), 396 Ill. 125, 128, 71 N.E.2d 84.

In this case, the circuit court reviewed Judy S.'s testimony and determined that it satisfied the requirements of the statute. During pretrial proceedings, the court, the prosecutor, and defense counsel searched for guidelines as to how the evidentiary hearing was to be performed. The court even contacted Springfield in an attempt to clarify the issue. The court finally stated that according to the statute, the time, content, and circumstances of the statement had to show safeguards of reliability before it would be admissible. Defense counsel stated that they were "stuck with the statute," and although she requested a hearing with actual witness testimony, she admitted that they had "absolutely nothing to guide" them.

The court went down the list of possible witnesses and determined, using the prosecutor's written statement of each witness' testimony, whether there were the required safeguards of reliability using time, content, and circumstances as its guide. The court determined that Judy S.'s testimony met the statutory requirements for admissibility. When the court stated that no evidentiary hearing would be held for Judy S., it meant only that Judy S. would not testify at the hearing. As is evident, however, it did in fact hold a hearing.

Defendant cites case law which requires an evidentiary hearing, but which does not state that the hearing must consist of witness testimony. (*People v. Mitchell* (1993), 155 Ill. 2d 344, 614 N.E.2d 1213; *People v. Smith* (1991), 221 Ill. App. 3d 605, 582 N.E.2d 317, *appeal denied* (1992), 144 Ill. 2d 641, 591 N.E.2d 28; *People v. Coleman* (1990), 205 Ill. App. 3d 567, 563 N.E.2d 1010, *appeal denied* (1991), 136 Ill. 2d 547, 567 N.E.2d 335.) Further, *Mitchell* is distinguishable in that it concerned a minor victim whose testimony was described by the court as "ambiguous, inconsistent and contradictory in a case in which credibility of the witnesses and reliability of their testimony was particularly important." (*Mitchell*, 155 Ill. 2d at 350.) In this case, J.S.'s testimony was clear, consistent, and believable.

*Smith* is also distinguishable, as is *Coleman*. In *Smith*, the victim did not testify at trial, and the testimony of two of the four witnesses was deemed inadmissible by the reviewing court. No hearing of any kind was held. (*Smith*, 221 Ill. App. 3d at 608.) In *Coleman*, the victim began to testify but was unable to continue. The court characterized her as an unavailable witness. *Coleman*, 205 Ill. App. 3d at 582-83.

Finally, defendant cites *People v. Morgan* (1994), 259 Ill. App. 3d 770. In that case, this court held that the circuit court erred in "fail[ing] to consider any evidence before deciding that the hearsay testimony was admissible under section 115—10 of the Code." (*Morgan*, 259 Ill. App. 3d at 779.) The court stated that "[t]he statute

requires the court to make factual findings regarding the reliability of the statements made out of court." (*Morgan*, 259 Ill. App. 3d at 779.) In that case, "since the trial court heard no evidence, it could make no such findings." (*Morgan*, 259 Ill. App. 3d at 780.) While the parties could have proceeded on stipulations, in *Morgan* not only were there no stipulations, the parties actively disagreed about what the evidence would show. (*Morgan*, 259 Ill. App. 3d at 780.) The court concluded that "[t]he discussion between counsel and the trial court was not a 'hearing' within the meaning of the statute." *Morgan*, 259 Ill. App. 3d at 780.

■ The circuit court in this case held a hearing as required by statute, although the proposed witness did not testify at that hearing. Although there were no stipulations, the prosecution's offer of proof was sufficient. The court found the proposed testimony by Judy S. to be reliable. The minor victim testified and was subject to cross-examination. All the requirements of the statute were met, and the hearsay testimony of Judy S. was properly admitted.

## B

The circuit court also held an evidentiary hearing to determine if the hearsay testimony of Tarik Dwiek would be admissible. Dwiek testified at this hearing, and the circuit court found the requisite indicia of reliability to find the proposed testimony admissible.

In *People v. Zwart* (1992), 151 Ill. 2d 37, 600 N.E.2d 1169, the Illinois Supreme Court held that the circuit court abused its discretion by admitting unreliable hearsay statements pursuant to section 115—10. In *Zwart*, the three-year-old complainant made out-of-court statements to her mother and to a therapist, but did not testify at trial. In evaluating the reliability of the hearsay statements, the supreme court looked to the time, content, and circumstances of the statements, as required by the statute. (*Zwart*, 151 Ill. 2d at 43-46.) The content of the statements tended to support their reliability (*Zwart*, 151 Ill. 2d at 44), but neither the timing nor the circumstances surrounding the making of the statements did so. *Zwart*, 151 Ill. 2d at 44.

The circumstances did not support the reliability of the statements in *Zwart* because the juvenile victim was interviewed at least three times prior to making any statements implicating the defendant, and no evidence regarding these interviews was introduced. It was thus impossible for the court to determine whether the child might have been susceptible to suggestions regarding her abuse. It was also impossible for the court to determine if the child's precocious knowledge of sexual matters was due to abuse or suggestive interviewing techniques. *Zwart*, 151 Ill. 2d at 44-45.

The timing of the statements also did not support their reliability in *Zwart*. The statements were made some four to six weeks following the alleged abuse. Although delay in reporting in itself does not preclude a finding that such statements are admissible, when combined with other elements (initial denial of abuse, making statements only after significant adult intervention) delay becomes more important. *Zwart*, 151 Ill. 2d at 45-46.

In this case, the court determined in its discretion that the time, content, and circumstances requirements of the statute were met. Absent an abuse of that discretion, this court will not find otherwise. *People v. Franklin* (1990), 135 Ill. 2d 78, 96, 552 N.E.2d 743, *cert. denied* (1990), 498 U.S. 881, 112 L. Ed. 2d 182, 111 S. Ct. 228; *People v. Deavers* (1991), 220 Ill. App. 3d 1057, 1068, 580 N.E.2d 1367, *appeal denied* (1992), 143 Ill. 2d 641, 587 N.E.2d 1018.

■ Unlike the more than four weeks that passed between the assault and the outcry in *Zwart*, in this case less than half that time passed. The alleged attack took place on December 23, and J.S. told Dwiek about it sometime around Christmas, certainly prior to January 10. The failure of a young assault victim to make a prompt complaint is easily understandable because of the natural sense of shame, fear, revulsion, and embarrassment felt by children under such circumstances. (*Deavers*, 220 Ill. App. 3d at 1070.) Such delay merely presents a factor for the circuit court to consider when evaluating the totality of the circumstances. (*Deavers*, 220 Ill. App. 3d at 1069.) Further, Dr. Yballe testified in this case that it was common for children to delay reporting sexual abuse. The circuit court found that the time of J.S.'s statement to Dwiek did not render the statement unreliable, and this court does not find that the circuit court abused its discretion in doing so.

The circuit court also found that the contents of J.S.'s statement were trustworthy. It is unlikely that a seven-year-old boy in his circumstances would have such complete knowledge of oral sex, and it is highly doubtful that such a child could fabricate the details testified to. This court does not find that the circuit court abused its discretion in making this finding, either.

Finally, the circuit court also found that the circumstances of the statement also helped render it reliable. The statement was made in response to a general question. J.S. was consistent in the statements made to Dwiek and to Judy S. There was no adult intervention, as there may have been in *Zwart*. Dwiek did not prod him into making the statement; J.S. offered it spontaneously to an older boy whom he trusted. This court does not find that the circuit court abused its discretion in finding the circumstances of J.S.'s statement to Dwiek rendered the statement reliable.

Since the circuit court found that the time, contents, and circumstances of J.S.'s statement to Dwiek rendered the statement reliable, and since this court does not find that the circuit court abused its discretion in making that determination, this court does not find that the circuit court erred in admitting the statement into evidence.

## II

### A

Defendant next asserts that the judge failed to instruct the jury as to the proper review of the hearsay statements admitted pursuant to section 115—10, and that consequently defendant was denied a fair trial. The State responds that since the court gave an appropriate instruction before closing arguments, any error was harmless because defendant suffered no harm and was not denied any substantial right.

Section 115—10(c) specifically states:

"If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the circumstances under which the statement was made, and any other relevant factor." (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(c) (now codified as 725 ILCS 5/115—10(c) (West 1992)).)

During the instruction conference, two attorneys were present on defendant's behalf. Defense counsel thoughtfully objected and argued jury instructions where they believed it necessary. Defense counsel did not offer an instruction regarding Illinois Pattern Jury Instructions, Criminal, No. 11.67 (2d ed. Supp. 1989) (hereinafter IPI Criminal) (now IPI Criminal No. 11.66 (3d ed. 1992)). This is the instruction to be given when statements are admitted pursuant to section 115—10. The instruction reads:

"Statements Admitted Under Section 115—10 of the Code of Criminal Procedure

You have before you evidence that _____ made [(a statement) (statements)] concerning [(an) (the)] offense[s] charged in this case. It is for you to determine [whether the statement[s] [(was) (were)] made, and, if so,] what weight should be given to the statement[s]. In making that determination, you should consider the age and maturity of _____, the nature of the statement[s], [and] the circumstances under which [(a) (the)] statement[s] [(was) (were)] made[, and _____]." IPI Criminal 2d No. 11.67 (Supp. 1989).

Although IPI Criminal 2d No. 11.67 (Supp. 1989), was not given

with the other instructions, directly following the instruction conference and prior to closing arguments the court instructed the jury in accordance with section 115—10(c), as follows:

"Ladies and Gentlemen, we now come to the point in time which the closing arguments will be given by the attorneys.

Under the Illinois Statutes there was *** submitted testimony by Tarik Dwiek and Judy [S.], in that the young man, [J.S.], *** said certain things to those people, and those people testified to what he said.

The Illinois Statute says that is permissible to be admitted into evidence, and after it is so admitted, the Court must instruct the Jurors as follows:

Under Chapter 38, Section 115, Subsection dash ten, subparagraph (b)(c), it is for the Jury to determine the weight and credibility to be given the statement, and in making that determination the Jury shall consider the age and maturity of the child, the nature of the statement, and the circumstances under which the statement was made, and any other relevant factor."

Following closing arguments, the court further instructed the jurors. It told them that they were the sole judges of believability and that they were to determine the weight to be given to the testimony. The court stated:

"In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his age, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

■ In *People v. Mitchell* (1993), 155 Ill. 2d 344, 614 N.E.2d 1213, the Illinois Supreme Court held that where evidence was admitted pursuant to section 115—10, it was error for the circuit court not to instruct the jury as required by the statute. The court rejected the State's argument that another instruction sufficiently advised the jury in this regard. Had the above instruction been the only one given, it would have constituted plain error. But it was not the only one given. When coupled with the instruction given prior to closing arguments, which fulfilled the requirements of the statute, any error in failing to give the instruction with the other instructions subsequent to closing arguments is rendered harmless. Defendant was not denied any substantial right. *Booker*, 224 Ill. App. 3d at 556.

## B

Defendant additionally asserts that defense counsel's failure to request that the jury be instructed pursuant to section 115—10(c) constitutes ineffective assistance of counsel. Defendant cites *People v.*

*Wilson* (1986), 149 Ill. App. 3d 1075, 501 N.E.2d 863, *appeal denied* (1987), 114 Ill. 2d 556, 508 N.E.2d 735, for the proposition that defense counsel's failure to request the instruction was unreasonable and cannot be considered a matter of strategy or tactics. In *Wilson*, counsel was found ineffective for failing to tender instructions under section 115—10.1, regarding the admissibility of prior inconsistent statements, where that statute does not even require an instruction as section 115—10 does. *Wilson*, 149 Ill. App. 3d at 1078.

The State responds that, even if counsel's failure to request that the jury be instructed pursuant to section 115—10 was ineffective, defendant was not prejudiced thereby and that, therefore, any claim of ineffective assistance of counsel must fail.

Counsel is ineffective when, in light of all the circumstances, his or her acts or omissions are outside the range of reasonable professional assistance. In addition, defendant must show there is a reasonable probability that, but for counsel's errors, the outcome would have been different. (*Strickland v. Washington* (1984), 466 U.S. 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) The burden is on the defendant to establish both his trial counsel's incompetence and the resultant prejudice. (*People v. Rodriguez* (1983), 117 Ill. App. 3d 761, 764, 454 N.E.2d 13.) This court need not determine whether counsel's performance was deficient before examining the prejudice suffered by defendant as a result of the alleged deficiencies. (*Albanese*, 104 Ill. 2d at 527.) In fact, this court should dispose of the entire claim of ineffective assistance of counsel based on the lack of sufficient prejudice if it is easier to do so. *People v. Sanders* (1991), 209 Ill. App. 3d 366, 376, 568 N.E.2d 200, *appeal denied* (1991), 139 Ill. 2d 602, 575 N.E.2d 921.

•4 Here, defendant has failed the prejudice prong of the *Strickland* test: he has failed to establish that there is a reasonable probability that, but for counsel's errors, the outcome would have been different. As indicated above, any error in the failure to give the instruction at issue with the other instructions following closing arguments was rendered harmless by the other instruction given at that time.

This court therefore declines to grant defendant a new trial based upon ineffective assistance of counsel.

### III

Defendant next asserts that he was denied a fair trial where the State, during closing argument, improperly negated its burden of proof, wrongly told the jury that defendant could be acquitted only if

the jury found that all the State's witnesses were lying, and improperly argued facts not in evidence. The State responds that defendant waived all three of the alleged improper prosecutorial remarks by failing to object at trial and by failing to raise them in his post-trial motion. Alternatively, the State argues that the three statements complained of were proper.

An issue is waived for purposes of appeal unless there is an objection made during trial and the error is specified in the motion for a new trial; neither one alone is sufficient. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-88, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Allegations of improper closing argument by a prosecutor are waived if the remarks are not specifically identified in the defendant's motion for a new trial. General allegations are insufficient. (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 312, 570 N.E.2d 344, *appeal denied* (1991), 141 Ill. 2d 547, 580 N.E.2d 121.) All three of the remarks complained of are waived for purposes of appeal.

Nor is this issue reviewable under the plain error exception to the waiver doctrine. The exception is codified in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), which allows for review of errors not previously raised but which affect substantial rights. Relief from such errors is granted when a serious injustice has been done to a defendant, or where the error is of such magnitude that it has denied the accused a fair and impartial trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, 404 N.E.2d 233.) There has been no such serious injustice or error of such magnitude in this case.

Even if this issue is not considered waived, the prosecutor's statements were proper.

## A

In rebuttal closing argument, the prosecutor asserted:

> "Counsel talks about beyond a reasonable doubt. Ladies and Gentlemen, that burden is met in every criminal case in the United States everyday, and Ladies and Gentlemen, we have met that burden here today."

Defendant argues that the prosecutor was asserting that juries always find that the prosecution meets its burden. In doing so, according to defendant, the State improperly reduced the burden of proof beyond a reasonable doubt to a *pro forma* detail, thus denying defendant a fair trial.

In *People v. Martinez* (1979), 76 Ill. App. 3d 280, 395 N.E.2d 86, the court held that the prosecutor's comments "that people 'throughout the United States *** are being found guilty beyond a reasonable

doubt every day of the week' " were improper because the comments lessened the importance of the State's burden "by implying that reasonable doubt was merely a pro-forma or minor detail." (*Martinez*, 76 Ill. App. 3d at 285.) Similarly, in *People v. Frazier* (1982), 107 Ill. App. 3d 1096, 438 N.E.2d 623, the court held that the prosecutor's remarks during closing argument that "finding someone guilty beyond a reasonable doubt *** is done every day in courts all over the country" lessened the importance of the State's burden of proof and were improper. *Frazier*, 107 Ill. App. 3d at 1101-02.

More recently, however, in *People v. Woods* (1988), 173 Ill. App. 3d 244, 527 N.E.2d 485, *appeal denied* (1988), 123 Ill. 2d 565, 535 N.E.2d 409, the prosecutor argued to the jury that the burden of proof was not insurmountable and that the State prevailed in criminal trials "every day, all year, all the time." These comments were held to be within the legitimate bounds of argument. (*Woods*, 173 Ill. App. 3d at 250.) In *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301, our supreme court held that the prosecutor's comments, that the burden of proof was "not unreasonable" and that it was "met each and every day in court," did not reduce the State's burden or shift the burden to the defendant. *Bryant*, 94 Ill. 2d at 523-24.

■ The prosecutor's comments in this case do not rise to the level of reducing the State's burden to a *pro forma* detail, denying defendant a fair trial. Defendant's conviction should not be reversed for this reason.

### B

Defendant further claims that the prosecutor shifted the burden by arguing that in order to acquit defendant, the jury would have to find that the prosecution witnesses lied. The prosecutor stated:

"For you to find him not guilty, you have to call [J.S.] a liar. Not only do you have to call him a liar, but you have to tell Tarik [Dwiek], his mother, and the doctor, all who corroborate this altogether."

Later in closing argument, the prosecutor said:

"The victim came here and testified, and you watched him testify, and I, as I said before, to find the Defendant not guilty you have to call [J.S.] a liar."

In *People v. Cole* (1980), 80 Ill. App. 3d 1105, 400 N.E.2d 931, the appellate court held that it was error for the prosecutor to inform the jury that in order to acquit the defendant they had to find that the prosecution witnesses were lying. (*Cole*, 80 Ill. App. 3d at 1108.) However, the court stated that the testimony of witnesses may have been a case of mistaken identity, or the witnesses did not testify to

more than chain of custody. (*Cole*, 80 Ill. App. 3d at 1108.) In *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827, the court held that the prosecutor erred in closing argument when he stated that the jury could either believe the defendant or the State's witnesses, and if they believed the State's witnesses they must find defendant guilty. (*Crossno*, 93 Ill. App. 3d at 822.) In *Crossno*, however, defendant's guilt rested on a determination of state of mind, rather than on whether the jury believed the defendant or the prosecution witnesses, as here. *Crossno*, 93 Ill. App. 3d at 821.

In *People v. Thomas* (1988), 172 Ill. App. 3d 172, 526 N.E.2d 467, the prosecutor commented that either the defendant or the police officer had to be lying, and the court found that "[u]nder the circumstances, *** the prosecutor merely commented on the evidence and inferences arising therefrom, and any impropriety in phrasing the remark did not constitute plain error." *Thomas*, 172 Ill. App. 3d at 180.

Where the prosecutor's version of the facts varies substantially from the defendant's version, the attorneys are allowed broad latitude in drawing reasonable inferences and conclusions from the evidence. (*People v. Smith* (1987), 158 Ill. App. 3d 595, 600, 511 N.E.2d 770, *appeal denied* (1987), 117 Ill. 2d 551, 517 N.E.2d 1093.) In this case, the prosecutor made a legitimate inference from the testimony and the facts of the case that in order for the jurors to believe defendant, they must believe that J.S. was lying; he did not say that acquittal meant the other prosecution witnesses were lying. The prosecutor said merely that the jurors had to "tell" the other witnesses. There was direct conflict in the evidence at trial. Defense counsel argued in closing that J.S. told "a horrible story" and otherwise implied that he was lying. Defendant testified that J.S. was a liar and said that he did not sexually assault him. J.S. said that defendant did sexually assault him. It was thus a logical inference from the evidence that either defendant or J.S. was lying. The prosecutor's statements do not require reversal.

## C

Defendant additionally asserts that the State wrongly argued facts not in evidence. In closing rebuttal argument, the State argued:

> "Now, if that wasn't happening, I mean it's right there, it's right there. Not only that, but that was corroborated. You heard Connie Alousch, Connie Alousch was told, is another young girl, who eventually went down, and they told [J.S.] to tell his mother, and [J.S.] told his mother."

In fact, Connie Alousch never testified, and there was no evidence admitted as to what J.S. told Connie.

Assumptions and statements of fact not based on the evidence in the case may not be properly argued to the jury. (*People v. Romero* (1967), 36 Ill. 2d 315, 223 N.E.2d 121; *People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280.) In *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773, this court held that it was error for the prosecution to infer the content of testimony not heard.

In this case, however, the prosecutor did not state that Connie Alousch testified. The prosecutor was merely summarizing the testimony of J.S., Judy S., and Dwiek about what they had told Connie and what Connie's involvement was. Because the trial court is in a better position than a reviewing court to determine the prejudicial effect, if any, of a remark made during closing argument, the circuit court's ruling on such argument must be upheld by this court unless there was a clear abuse of discretion. (*People v. Smith* (1987), 158 Ill. App. 3d 595, 511 N.E.2d 770.) Further, the jury is presumed to abide by the court's instructions that closing arguments are not evidence, and that it should disregard any statements or arguments not based upon evidence. Any harm from improper argument is therefore cured. *People v. Lasley* (1987), 158 Ill. App. 3d 614, 626, 511 N.E.2d 661, *appeal denied* (1988), 119 Ill. 2d 566, 522 N.E.2d 1251.

## IV

Defendant next asserts that the circuit court abused its discretion in sentencing defendant to a term of imprisonment of 18 years, given the fact that he had no prior criminal convictions and considering his rehabilitative potential. The State responds that the sentence imposed by the circuit court is entitled to great deference and that defendant has failed to demonstrate an abuse of discretion in sentencing.

Initially, this court notes that since the Illinois Supreme Court has reversed *People v. Lewis* (1993), 235 Ill. App. 3d 1003, 602 N.E.2d 492, *rev'd* (1994), 158 Ill. 2d 386, contrary to the appellate court's holding in *People v. Macke* (1992), 224 Ill. App. 3d 815, 587 N.E.2d 1113, defendant was not required to file a motion to reduce his sentence in order to preserve this issue on appeal. There is no waiver in this case.

Defendant was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14 (now 725 ILCS 5/12—14 (West 1992))), a Class X felony. The range for sentencing for a Class X felony is 6 to 30 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3) (now 730 ILCS 5/5—8—1(a)(3) (West 1992)).) The sentencing judge also stated that defendant was eligible for an extended term in this case; the extended term range for a Class X felony is 30 to 60

years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(2) (now 730 ILCS 5/5—8—2(a)(2) (West 1992)).) Defendant was thus eligible for a range of sentences from 6 to 60 years.

The sentence imposed by the circuit court is entitled to great deference. (*People v. Streit* (1991), 142 Ill. 2d 13, 18, 566 N.E.2d 1351.) Its ruling will not be disturbed absent an abuse of discretion. (*Streit*, 142 Ill. 2d at 19.) Further, a sentencing judge is presumed to have considered all relevant factors absent a contrary showing in the record. (*People v. Back* (1992), 239 Ill. App. 3d 44, 80, 605 N.E.2d 689, *appeal denied* (1993), 151 Ill. 2d 567, 616 N.E.2d 338.) The sentencing judge is not bound to impose a particular sentence merely because the defendant has no criminal record. *Back*, 239 Ill. App. 3d at 80.

A defendant's lack of remorse is a proper factor to consider in sentencing. (*People v. Ward* (1986), 113 Ill. 2d 516, 528, 499 N.E.2d 422, *cert. denied* (1987), 479 U.S. 1096, 94 L. Ed. 2d 168, 107 S. Ct. 1314.) The degree of harm caused to a victim can also contribute to the severity of the sentence imposed. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 269, 497 N.E.2d 1138.) Further, the legislature has expressed its meaning clearly in that it intends to "apply harsher penalties in cases where [sexual] assaults involve children." *People v. Ferguson* (1989), 132 Ill. 2d 86, 98-99, 547 N.E.2d 429.

Defendant cites several cases in which those convicted of sexual acts with children received less severe sentences than defendant received in this case, and the State cites two where the defendants received more severe sentences. Neither set of cases is particularly relevant, however, since as defendant himself argues, a reasoned judgment as to a proper sentence must be based on the particular circumstances of each case. *People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168.

In sentencing defendant to imprisonment for 18 years, the court stated:

> "The jury came to the conclusion that you have committed the offense by taking advantage of your position as an adult and in sort of a surrogate parental authority in which you abused the seven-year-old boy. This you did in the jury's findings, to satisfy your own desires and wants. I concur with the jury's findings in this particular case, and I think they rendered the correct verdict from the evidence that I heard.
>
> *** The Court notes that there is no prior conviction in the defendant's pre-sentence investigation, and although the defendant did not threaten serious harm, he surely imposed a *** mental harm, *** upon the victim in this particular case.
>
> It's fortunate for the defendant that he has no prior history of

this matter. Although he may technically qualify for the extended term, the Court finds that this is not the proper case in which to impose the extended term.

I guess the most difficult job for a judge to do is the sentencing in order to deter people from committing this offense and imposing some punishment considering all these particular factors."

■ The judge clearly considered factors in aggravation and in mitigation, and arrived at a sentence of 18 years, well within the available range. Defendant has not made a clear showing of abuse of discretion, and without such a showing, this court will not disturb a sentence within the statutory range.

## V

Defendant next asserts that the court erred in ordering restitution of $750 where the State presented no evidence of the cost of continuing counseling and no evidence of defendant's ability to pay. The State responds that the court does not have to determine defendant's ability to pay and that the court does not have to explain its calculations determining restitution if no party requests the information.

Section 5—5—6 of the Unified Code of Corrections provides in pertinent part:

"If the court determines that an order directing the offender to make restitution is appropriate the offender may be sentenced to make restitution which shall be determined by the court as hereinafter set forth:

\*\*\*

(b) \*\*\* [T]he court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge \*\*\*.

\* \* \*

(e) The court may require the defendant to apply the balance of the cash bond, after payment of court costs, and any fine which may be imposed to the payment of restitution.

(f) Taking into consideration the ability of the defendant to pay, the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years within which payment of restitution is to be paid in full.

(g) The court shall, after determining that the defendant has the ability to pay, require the defendant to pay for the victim's counseling services if:

(1) the defendant was convicted of an offense under Section[ ] \*\*\* 12—14 \*\*\* of the Criminal Code of 1961 [aggravated criminal sexual assault], \*\*\* and

(2) the victim was under 18 years of age at the time the offense was committed and requires counseling as a result of the offense." Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—6 (now 730 ILCS 5/5—5—6 (West 1992)).

●7 Defendant's ability to pay restitution is relevant in this case, notwithstanding the State's assertion to the contrary, because the statute plainly states that "[t]he court shall, *after determining that the defendant has the ability to pay,* require the defendant to pay for the victim's counseling services if" defendant is convicted of aggravated criminal sexual assault, and the victim is under the age of 18. (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—6 (now 730 ILCS 5/5—5—6 (West 1992)).) These are the circumstances of this case.

However, the court had already determined that defendant had the ability to pay before it imposed restitution. A cash bond had been posted, and restitution could be taken from the bond. When pronouncing sentence, the court stated:

"Court hereby sentences the defendant to a period in the Illinois Department of Corrections for eighteen years, and the restitution of seven hundred and fifty dollars to the victim will be taken from the cash bond."

Defendant clearly had the ability to pay, so restitution was properly imposed.

In order for the amount of restitution set to be valid, the court must calculate the expenses involved. (*People v. Kirkman* (1993), 241 Ill. App. 3d 959, 609 N.E.2d 827.) In *People v. Cole* (1990), 193 Ill. App. 3d 990, 996, 550 N.E.2d 723, the Appellate Court, Fourth District, held that in determining restitution for counseling in a sex abuse case, proof of the expenses incurred was a prerequisite to any payment of restitution.

The State's argument that it is likely that the court had calculated the amount of restitution prior to commencement of the sentencing hearing is not supported by the record. While it is true that J.S. had received counseling services for two years prior to defendant's conviction, and would require further therapy, the statute clearly requires that the amount be calculated more precisely. It is not enough that, as the State asserts, "the funds awarded the victim were *likely* to repay" costs already incurred (emphasis added), or that "the fact that a formula was used cannot be ruled out"; the court should have determined on the record what those costs were. It is not relevant that defendant did not request an accounting; the statute does not include a waiver provision.

While the circuit court was correct in ordering restitution be

paid, it erred in determining the amount of restitution without properly determining the amount of counseling expenses incurred. We therefore vacate the order of restitution and remand the cause for a proper determination of the amount of restitution to be ordered.

## VI

Defendant finally asserts that, pursuant to the one-act-one-crime doctrine, where all of defendant's convictions were based on a single act, three of defendant's four convictions must be vacated. Defendant further asserts that, since it cannot be determined with certainty that the counts to be vacated did not influence the judge's sentencing decision, resentencing is required following vacation of the additional convictions. The State responds that defendant was properly sentenced on his aggravated criminal sexual assault conviction, and that, since sentence was not imposed on the other convictions, they are not final judgments and may not be appealed.

Defendant was convicted of aggravated criminal sexual assault, a Class X felony; two counts of criminal sexual assault, Class 1 felonies; and aggravated criminal sexual abuse, a Class 2 felony. All four counts were based on a single act, allegedly committed by defendant on December 23, 1987. The orders committing defendant to the Cook County Department of Corrections, the notification of final felony disposition, and the order of sentence and commitment to the Illinois Department of Corrections included in the record contain listings of all four convictions.

The Illinois Supreme Court held in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, that prejudice results to a defendant when more than one offense is carved from the same physical act. A defendant may be convicted only of the most serious of the crimes charged, where the other charges are lesser offenses arising from the same physical act.

In this case, defendant's convictions for criminal sexual assault and aggravated criminal sexual abuse, which stem from the same physical act as his conviction for aggravated criminal sexual assault and are lesser offenses, should not have been indicated on the mittimus. Although it is true that defendant was sentenced only on the most serious crime of which he was convicted, the mittimus in this case must be corrected to reflect the entry of judgment for only one offense.

As stated above, defendant was sentenced only on the conviction for aggravated criminal sexual assault, a Class X felony. The sentencing range for Class X felonies is 6 to 30 years. (Ill. Rev. Stat.

1987, ch. 38, par. 1005—8—1(a)(3) (now 730 ILCS 5/5—8—1(a)(3) (West 1992)).) Defendant's other convictions were for Class 1 and Class 2 felonies; the sentencing range for a Class 1 felony is 4 to 15 years (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(4) (now 730 ILCS 5/5—8—1(a)(4) (West 1992))), and the sentencing range for a Class 2 felony is 3 to 7 years (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(5) (now 730 ILCS 5/5—8—1(a)(5) (West 1992))). Defendant's 18-year sentence, then, is well within the allowable range for a Class X felony, but outside the allowable range for either a Class 1 or a Class 2 felony. The court could only have been considering the Class X felony during sentencing, because the sentence imposed was only appropriate for that offense.

Additionally, before sentencing defendant, the judge said that "the jury came to the conclusion that you committed *the offense* by taking advantage of your position as an adult." (Emphasis added.) He further stated that "I guess the most difficult job for a judge to do is the sentencing in order to deter people from committing *this offense* and imposing some punishment considering all these particular factors." (Emphasis added.) The judge twice referred to defendant's *offense* in the singular, indicating that the sentence is for one offense only.

Defendant cites three cases in support of his argument that where it cannot be determined with certainty that the vacated counts did not influence the judge's sentencing decision, resentencing is required. None of these cases, however, is persuasive here. In *People v. Williams* (1991), 215 Ill. App. 3d 800, 576 N.E.2d 68, *appeal denied* (1991), 142 Ill. 2d 664, 584 N.E.2d 139, the defendant was convicted of two counts of murder and one count of armed violence, and sentenced on all three counts. When one count of murder and the armed violence count were vacated, a remand was necessary for resentencing. (*Williams*, 215 Ill. App. 3d at 816.) In *People v. Bone* (1982), 103 Ill. App. 3d 1066, 432 N.E.2d 329, the defendant was convicted of two counts of murder, and when one count was vacated, the court could not say with certainty on the record before it that the sentencing judge would have imposed the same 40-year sentence without the second conviction. The court therefore ordered a new sentencing hearing. (*Bone*, 103 Ill. App. 3d at 1069.) And, in *People v. Walton* (1981), 94 Ill. App. 3d 903, 419 N.E.2d 495, the court was not convinced that the total number of convictions did not have any effect on sentencing, and remanded for a new sentencing hearing on that basis. (*Walton*, 94 Ill. App. 3d at 911.) In this case, the record supports the inference that the sentencing judge would have imposed the same 18-year sentence without the additional convictions. The

three additional convictions had no effect on sentencing. The sentence imposed was well within the allowable range; there is no indication that the court abused its discretion in sentencing; the court stated that it was sentencing defendant for his *offense* (in the singular); and the sentence imposed was outside the range for the convictions to be vacated. There is no need to remand for a new sentencing hearing.

For all the above reasons, we affirm defendant's conviction and sentence for aggravated criminal sexual assault, vacate defendant's convictions for the lesser offenses, vacate the order of restitution, and remand for a determination of the actual out-of-pocket expenses incurred for the victim's counseling. Since we remand this cause for another purpose, we also instruct the circuit court to correct the mittimus to reflect conviction of aggravated criminal sexual assault only. Had there been no other reason for remand, we would have corrected the mittimus ourselves.

Affirmed in part; vacated in part, and remanded with instructions.

SCARIANO and McCORMICK, JJ., concur.